J. Donaldson Long and others *vs.* Elizabeth Long
and others.

*Devise to Several Trustees—Some trustees Declining to Accept
trust, Powers and authorities devolved upon remaining Trus-
tees—Jurisdiction—Who bound by a Decree—Effect of Sale
under Decree as to the rights of the Parties to the Cause—
When the proceedings of a Court are not Impeachable for
apparent Errors or Irregularities—Mode of correcting Ap-
parent errors and Irregularities—Devise of Real estate in
Trust—Legal estate Executed in Parties beneficially entitled—
Bequests of Personal property in regard to which a Trust is
created—Vesting of Absolute estate in the person entitled to
the Last use—Capacity in which Powers assigned are to be
Executed, when the Same person is both Trustee and Exe-
cutor—Extent to which Parties to a cause are bound by a
Decree therein—Rights of Purchaser under a Decree and
Sale—Effect of a Decree and Sale upon the Interests of
Parties claiming in Remainder—Limitations—Laches and
Lapse of time—Ratification—Estoppel—Incompetence of
Minor to Ratify a Sale—Allowance to Bona fide Purchasers
for Beneficial Improvements.*

In a devise of real estate to several trustees, and some decline to
accept the trust, the remaining trustees or trustee will not only take
the entire legal estate devised, but also all the powers and authori-
ties that were intended to be exercised in the execution of the
trust.

A Court of general equity jurisdiction, on application by a bill of
complaint to have one trustee removed and another appointed in
his stead, and to have real property that was held in trust under
the provisions of a will, sold for the interest and common benefit
of all parties concerned, has jurisdiction to decree a sale as prayed,
and such decree is conclusive upon all who were parties to it, either
actually or by sufficient legal representation.

A sale under such decree and a conveyance by the trustee, transfers to the purchaser all the rights, estate and claim of the parties to the cause existing at the date of the decree.

When the proceedings of a Court are collaterally brought in question, and it appears on their face that the subject-matter was within the jurisdiction of the Court, they are not impeachable for mere errors or irregularities that may be apparent; such errors and irregularities must be corrected by some direct proceeding either in the same Court to set them aside, or on appeal.

In a devise of real estate to a party and his heirs, in-trust for certain persons, and there be no active duties for such trustee to perform or discretion to exercise, the legal estate will become executed in the parties beneficially entitled.

In bequests of personal property in regard to which a trust is created, so soon as the purposes of the trust are subserved, or the object of the trust is at an end, the absolute estate becomes vested in the person entitled to the last use, unless there be an apparent intention to the contrary.

The fact that the same person is both trustee and executor under the will, will not operate to enlarge, transpose or transfer the powers from one capacity to the other, but the powers assigned to each capacity must be executed by the party in the capacity to which the powers are assigned.

A testator died in 1824, leaving a widow and six children. Some of the children were under the age of twenty-one years. The widow survived until 1850. The testator left a small personal estate, and certain real estate. After disposing of certain of his personal property, he devised and bequeathed the rest thereof and all his real estate to his executors in trust for the benefit of his children, and directed that his son A. K. L. during his life, and no longer, should receive the income of his share; and from and immediately after his decease the principal of his share should descend and be equally divided between all and every his child or children, their heirs, executors, &c., in equal proportions as tenants in common, share and share alike. He also directed that his daughters M. J. L. and A. J. L. should, during their respective lives, receive, and have applied to their several uses and benefits, the dividends, rents, &c., of their respective portions or shares, free from the control and liability for the debts of their husbands; " and from and immediately after the decease of my said daughters respectively, the principal share or portion of her so living shall descend to and

be equally divided between all and every her child or children, their heirs, &c., forever, as tenants in common, in equal proportions, share and share alike. And in the event of the decease of any of my children under age, and without lawful issue, the share or proportion of him, her or them so dying shall descend to and become the estate and property of the survivors or survivor of them my said children." The testator authorized and empowered his executors to divide and make partition of his estate among those entitled thereto, or for that purpose to sell and convey the same to the purchasers if a division could not otherwise be made. And in the event of the decease or refusal to act of either of his executors, he gave to the survivors or survivor all the power and authority given to them jointly. Three of the persons nominated as executors declined to act, and H. L. became the sole trustee and also the sole executor. In March, 1833, H. L. and the widow, and all the children of the testator except A. J. L. who was under age, joined in a petition to a Court of equity, representing the facts of the case, and praying that H. L. the trustee be removed; that some other person be appointed in his stead, and that the real estate left by the testator be sold, and that the proceeds of sale be paid to the parties entitled. The Court on the 8th of April, 1833, passed its decree removing H. L. from his position as trustee and appointing J. P. in his stead, to execute the trusts created by the will; and it further decreed that the property be sold by the new trustee, and that the same be conveyed to the purchaser, upon payment of the purchase money, " free, clear and discharged from all claim of the parties, and those claiming by, from or under them, or either of them." The new trustee sold the property and the sale was ratified by the Court; and the purchase money having been paid, the deed was made to the purchaser in pursuance of the decree. By the order of ratification, the trustee was directed to· pay over the amounts then due and payable to the several parties respectively entitled thereto, and to invest in his name as trustee, &c., the amounts thereby appearing to be due to the several parties, for whom he was directed to hold the same in trust. The shares of A. K. L., the son, and the daughters M. J. L. and A. J. L. were invested as directed by the Court. The interest on these shares thus invested was paid over by the trustee to A. K. L. and M. J. L. during their respective lives, and to A. J. L. until 1877, from which time she refused to receive it. M. J. L., who had intermarried with M. L. K., died in 1863, leaving six children, and all of them received their proportions of the shares of the proceeds of the sale of the property invested for their mother for life. A. K. L. died in 1866,

Long, *et al. vs.* Long, *et al.*

leaving six children, and the shares of the proceeds of the property sold that was invested for him for life, was divided and paid over to his children by the trustee. A. J. L., who had intermarried with T. W., died in 1881, leaving eight children surviving her. The share of the proceeds of sale that was invested for Mrs. W. for life, and for the benefit of her children, after her death, remained in the hands of the trustee, the children declining to receive it. On the 1st of June, 1880, a bill was filed by the children of A. K. L.; the children of Mrs. K. and Mrs. W. being made defendants, but after the death of Mrs. W. her children were joined as plaintiffs. The bill assumed that the estates limited in remainder to the children of A. K. L.. Mrs. K. and Mrs. W. in the real estate of the testator, were not disposed of or in any manner converted by the sale under the decree of 1833; and the children claimed their respective interests in that property as if no sale had ever been made. Various defences were set up by the numerous defendants, owners and occupants of the property. HELD:

1st. That the decree made in 1833, bound all the parties to the cause to the full extent of their rights and interests in the property, whether legal or equitable, and the sale and the conveyance by the trustee transferred to the purchaser all the rights, estate and claim of the parties to the cause existing at the date of the decree.

2nd. That the grandchildren of the testator, the devisees in remainder, took legal estates; and not being *in esse* at the date of the proceedings that resulted in the decree for a sale, the estates devised to them were but contingent remainders, and as there was no representation of the parties claiming in remainder, they were not bound by the decree.

3rd. That the remaindermen in fee had no right of entry until the previous equitable life estates, protected by the legal estate in the trustee, had expired, and consequently the twenty years since the right of entry occurred had not expired as to any of the parties claiming, at the time of the filing of the bill in June, 1880.

4th. That the defence of laches and lapse of time, as distinct from the defence of the Statute of Limitations, should not prevail as against the claims of the children of A. K. L. and those of Mrs. K.

5th. That the receipts and releases of the children of A. K. L. and Mrs. K. to the trustee, for their shares or proportions of the proceeds of the sale of the property, which had been invested under the order of the Court for their use, given with full knowledge of

all the facts, and with an understanding of their legal rights in respect to the subject-matter, must be regarded as a ratification of the sale by which the fund was produced.

6th. That the minor son of Mrs. K. who died before he attained his majority, was not competent himself to do any act that would have the effect to ratify the sale, nor could any one else ratify it for him during his minority, and his interest therefore in the real estate devolved upon his surviving sisters as his heirs-at-law.

7th. That the children of Mrs. W. having received no part of the proceeds of sale, and having positively refused to recognize the validity of the proceedings under which the sale was made, they or those representing them are entitled to one-sixth part of the real estate sold under the decree.

8th. That the defendants claiming and holding the property under the decree and sale of 1833, being innocent *bona fide* holders and possessors thereof, and supposing that they held a good and sufficient title thereto by virtue of a judicial sale, are entitled to a proportionate allowance for the value of all beneficial improvements of the property, according to its present improved condition.

APPEAL from the Circuit Court of Baltimore City.

This is an appeal from a decree dismissing the bill of the complainants, which was filed for the partition or sale of certain real estate in Baltimore City, described in the last will of Kennedy Long, deceased, as his "dwelling place." The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, and BRYAN, J.

*Julian I. Alexander, Thomas Worthington, Jr.,* and *I. Nevett Steele,* for the appellants.

By the true construction of Kennedy Long's will, Andrew K. Long and the daughters took equitable life estates, and the remainders were legal contingent remainders. *Ware vs. Richardson,* 3 *Md.,* 505 ; *Griffith vs. Plummer,* 32 *Md.,* 74; *Shreve vs. Shreve,* 43 *Md.,* 382;

*Timanus vs. Dugan,* 46 *Md.,* 402 ; *Taylor vs. Watson,* 35 *Md.,* 519 ; *Daniel vs. Whartenby,* 17 *Wall.,* 639 ; *Green vs. Green,* 23 *Wall.,* 486.   It is contended on the other side that the will expressly gives the trustees the fee.   But trustees under a will take only · so much of the legal estate, as the purposes of the trust require.   *Perry on Trusts, secs.* 317, 320 ; *Young vs. Bradley,* 101 *U. S.,* 782; *Taylor vs. Watson, supra.*   Nor is the rule different as to trusts of personalty.   *Denton vs. Denton,* 17 *Md.,* 403 ; *Rice vs. Barnett,* 1 *Spears' Eq.,* 579.   Again it is said the trustees and the executors being the same persons, the powers given by the will to the executors are annexed to the estate of the trustees, so as to make the trust active or alternatively, that the legal estate was devised to the executors in fee in trust for the family, &c., which objection is answered by *Keplinger vs. Maccubbin,* 58 *Md.,* 205. Then it is argued that the words "equally to be divided, &c.," in the gifts to the grandchildren, and the power to divide agreeably to the testator's will, carry the trust for partition over to the estates of the grandchildren.   But the first mentioned words mean no more than "share and share alike," and as to the others, the terms of the will are that the grandchildren are to take the principal share &c., given to the parents as tenants in common, *i. e.,* in *undivided* shares.   No duties were to be performed by the trustees or executors to the grandchildren, which required the legal estate to be in them.   The powers given to the executors are mere powers, and no case can be found where there is a direct devise, and afterwards powers of the sort described in this will are given to the executors, in which it has been held that the executors took anything but powers.

The case is thus not distinguishable from *Downin vs. Sprecher,* 35 *Md.,* 374, and *Shreve vs. Shreve,* 43 *Md.,* 382. It was attempted to answer these cases by saying they were cases of legal contingent remainders, and do not

apply to equitable contingent remainders; that the defendant, Henry Long, was the only acting trustee, and *represented* the unborn grandchildren, and thus the Court acquired jurisdiction. And this was founded on language used by Judge BOWIE, at page 293 in *Bolgiano vs. Cooke*, 19 *Md.*, "Without examining, &c.," and was sought to be confirmed by urging that Henry Long, as executor, had a power of partition or sale. But *Bolgiano vs. Cooke* is a branch of *Cooke vs. Husbands, et al.*, 11 *Md.*, 493, in which it is expressly laid down that equitable tenant for life and trustee cannot affect equitable contingent remainders. Besides, it is apparent that no such point as is supposed, was presented in *Bolgiano vs. Cooke*, and the doctrine of the case, except as to a precisely similar case, is overruled by *Earle vs. Turton*, 26 *Md.*, 23. Moreover *Bolgiano vs. Cooke* arose after the Act of 1835, ch. 380. Under the Act of 1816, ch. 154, the Court could sell only the legal estates of infants. The Act of 1818, ch. 193, was necessary to enable the Court to sell equitable titles to real estates of infants. The Act of 1835, ch. 380, extends the power of sale to cases to which it was not previously applicable, *i. e.*, to cases of trusts for infants by limitation of a use or a charge on rents and profits. But when we ask how this power is to be exercised under the Act of 1835, we are thrown back to the Act of 1816, ch. 154, which prescribes that the proceeding is to be commenced by bill or petition of the guardian of the infant whose trust estate is to be sold, and the infant having the estate is to appear, &c., and therefore all that can be said is that after the Act of 1835, the Court had the same power over trust estates, as it had over legal estates, the power to be exercised on the same terms and conditions, and if the Court could not, as it could not, sell the legal, it could not sell the equitable contingent remainder of an unborn infant. But in cases of trusts the power of the Court depends on the instrument creat-

ing the trust, and if that declares the trustee is to hold the property unchanged, the Court cannot defeat the intention of the trust under pretext that the conversion of the estate will promote the interests of the *cestui que trust.* Here the testator had expressly forbidden the estate to be converted until a certain time, which the Court had no jurisdiction to anticipate. *Dart, V. & P.,* 55; *Sugd. on Powers,* 335, 349–50; *Daly vs. James,* 8 *Wheat.,* .336; *Swaine vs. Denby,* 14 *Chan. Div.,* 326; *Dolan vs. Mayor, &c.,* 4 *Gill,* 395; *Worthington vs. Owings,* 9 *Gill,* 196; *Moale vs. Cutting,* 59 *Md.,* 510. If the law be as now suggested, what was the use of the Act of 1868, ch. 273, or of the 32nd rule in equity? The limits of the doctrine of representation are stated in *Downin vs. Sprecher,* and see *Richards vs. Fitzgerald,* 9 *Ir. Eq.,* 495; *Goodders vs. Williams,* 2 *Y. & C., N. R.,* 597; *Parkes vs. White,* 11 *Ves.,* 219. Nor did the presence of Henry Long in Court effect anything. He had only an estate *per autre vie,* and could represent no part of the inheritance. He agreed to nothing but to be removed. He did not profess, and was not called on to exercise any power. The proceeding was for a sale under the Act of 1785, ch. 72, carried on under the Act of 1818, ch. 193, the widow made a party plaintiff, and was irregular in every respect. There is no averment in the bill that the parties were needy, nor any case of extreme necessity alleged or made out; but if there had been, that would not have given jurisdiction. *Gould vs. Chappell,* 42 *Md.,* 466; *Tyson vs. Latrobe, Id.,* 325.

Establishing our title, we have a statutory right to partition under the Code. It is objected we are barred by limitations. But the title of Mrs. Knapp's children accrued only the 30th of May, 1863, of Captain Long's children in August, 1866, and of Mrs. Worthington's children in February, 1881. The case is directly within *Dugan vs. Gittings,* 3 *Gill,* 161; *Needles vs. Martin,* 33.

*Md.*, 619; and *Preston vs. Evans*, 56 *Md.*, 494. The case of *Crook vs. Glenn*, 30 *Md.*, 55, relied on upon the other side, is a case of a mortgage, and such cases are out of the rule, because the remaindermen may redeem. *Angell on Limitations, sec.* 464; and see *Perry on Trusts, sec.* 856; *Jackson vs. Schoonmaker,* 4 *Johns.*, 401; *Jackson vs. Lillick,* 8 *Johns.*, 268. Nor is the defence of *laches* or lapse of time available to the appellees. The appellants are not suing for an equity, but for a legal statutory right. The case of *McCoy vs. Poor*, 56 *Md.*, 205, is entirely different from theirs. They are not seeking to set aside a deed or the decree of 1833. They have the same time as at law. *Hagerty vs. Mann*, 56 *Md.*, 522; *Farmers Bank vs. Wayman*, 5 *Gill*, 358. Finally it is said that the Knapps and Longs who received parcel of what is said to be the proceeds of sale under the decree of 1833, are barred by their releases given to the trustee. But the sums received by these persons were blended of pure personalty and proceeds of sale of real estate in the proportion of two to one, the six children of A. K. Long receiving together as proceeds of sale of real estate only $770.58, as appears by the auditor's account. Estoppel by receipt of proceeds of real estate can in reason only apply where a party knowingly receives the proceeds of a voidable sale of his own estate. But the decree of 1833 professed only to sell the title of the parties to the suit, and the proceeds were the proceeds of sale of that title, not of our title. But the evidence of Mrs. Chandler, and of George W. Long, which by agreement stands as the evidence of all the descendants of A. K. Long and Mrs. Knapp, shows affirmatively that the parties who received a part of the fund from the trustee received it in complete ignorance of the fact that any part of it purported to be derived from a sale of the premises in controversy, and of their rights in them under Kennedy Long's will. The evidence shows that when the suit was instituted, the only parties present in Mary-

land were the females of the family, that they left for the far West immediately after the suit was commenced, and never returned to Maryland, and that the releases were all executed in remote parts of the country, or out of the country where the parties had no access to the records of Baltimore County. Now a person is not estopped by his acts or conduct, unless it is shown he acted with full knowledge of all the facts which affect his rights. *Pairo vs. Vickery,* 37 *Md.,* 464; *Cumb. Coal & Iron Co. vs. Sherman, et al.,* 20 *Md.,* 151; *Howard vs. Carpenter,* 11 *Md.,* 279 ; *Lammott vs. Bowly,* 6 *H. & J.,* 525. In *Hanson vs. Worthington,* 12 *Md.,* 436, the complainants recovered against a release in full. Ordinarily, a title to land does not pass by a collateral satisfaction, and "in equity," said the Court in *Cockerell vs. Cholmeley,* 1 *Russ. & Myl.,* 425, "no man can be held to confirm a title by any act of his, unless he was fully aware at the time, not only of the fact upon which the defect of title depends, but also upon the consequence in point of law." Here the remainderman had enjoyed part of the proceeds of a void sale, and had filed a bill, and obtained an order for the payment out of the rest of the fund, yet he was relieved, and the decree was affirmed in the House of Lords. 1 *C. & F.,* 60. The law is laid down just as strongly in *Trader vs. Lowe,* 45 *Md.,* 11, and *Hoffman Co. vs. Cumberland Co.,* 16 *Md.,* 509. And means of knowledge is quite a different thing from knowledge in such cases. *Earl Beauchamp vs. Winn,* *L. R.,* 6 *H. L.,* 213. Many of these cases were not cases of trust; certainly *Howard vs. Carpenter* was not. But besides, the doctrine of estoppel only applies where a person is seeking to assert some secret equity or trust, or lien ; not where the plaintiff's title is a matter of public record, open and accessible to all. Now Kennedy Long's will was on record, and its provisions were notice to all persons dealing with the property. *Tongue vs. Nutwell,* 17 *Md.,* 230; *Casey vs. Inloes,* 1 *Gill,* 501;

*Brown vs. Trustees, &c.*, 37 *Md.*, 108. Moreover, these releases were personal releases to the trustee. There was no privity between the trustee and Philip Hiss, or those claiming under him. Their title, whatever it was, was obtained long before the releases were executed, with no reference to them, and none of the defendants knew of their existence till after the institution of this suit; nor was their conduct in any way influenced by them. *Alexander vs. Walter*, 8 *Gill*, 249; *Wright vs. Hagen*, 24 *Verm.*, 143. These defendants bought in 1833 when the will was their title in which the title of these grandchildren was stated. They were bound to know what that title was—and have not been injured in any way. From the evidence, it was almost impossible that the grandchildren could discover what their rights were, and in fact it was discovered by accident. These parties were scattered all over the country. In some of the releases, there is no reference to the account of 1833; in some there is; but in the latter case what was there to induce the parties to look at it? They relied on Mr. Pennington, as a lawyer of repute, and a friend of the family. What would they know of property on which their grandfather lived, especially if they had heard as some of them had that the will had been broken? It is submitted that these releases were to a trustee confirming nothing, with no intention of confirming anything, and without knowledge of facts necessary to give validity to confirmation. The case is stronger than *Wilson vs. Md. Life Ins. Co.*, 60 *Md.*, 150. Lastly, the foreign guardians of Moses Knapp and William St. Clair Long, had no authority to receive from the trustee the shares of the fund attributable to them.

*M. R. Walter, Sebastian Brown,* and *S. Teackle Wallis,* for the appellees.

I.—1. Under the sale and conveyance by Josias Pennington, trustee, the purchasers acquired all the interest of Kennedy Long in the "dwelling place."

The shares of Thomas J. Long and James H. Long were given to them absolutely; and that their two-sixths vested in the purchasers is not disputed.

2. It is equally clear that the appellants have no interest in the share of Mrs. Balfour, who died after she attained the age of twenty-one years, without issue. Her share was given to her for life, with remainder to her children, and the will provided that in the event of her decease under age, and without lawful issue, her share should pass to the survivors or survivor of the testator's children, but no disposition was made of her share in the event of her dying *over* age and without children. There was, therefore, in this respect, an intestacy, and a reversion in fee vested in the heirs-at-law of the testator at the time of his death. All the heirs-at-law of the testator were parties to that suit, and that reversion passed, of course, to the purchasers. *Heald vs. Heald,* 56 *Md.,* 308, 310; *Neall, et al. vs. Cosden,* 34 *Md.,* 426, 427.

3. Three-fourths of an acre of the "dwelling place" was leasehold. Elizabeth Long, the testator's widow, having renounced the provisions of the will in her favor, became entitled to an undivided one-third of this three-fourths of an acre, free from any of the restrictions contained in the will, and it passed to the purchasers, she having been a party to the cause.

4. Baltimore County Court and the trustee intended to sell and convey to the purchasers, and the latter supposed that they were buying and receiving the entire interest of the testator at the time of his death, as will appear by the record of the case and the trustee's deed.

5. In judicial sales every fair legal intendment ought to be made to sustain them. Courts of justice guard and maintain with jealous vigilance the title of purchasers acquired under them. *Shilknecht vs. Eastburn's Heirs,* 2 *G. & J.,* 131; *Tomlinson vs. Devore,* 1 *Gill,* 349; *Elliott vs. Knott,* 14 *Md.,* 134; *Druid Park Heights Co. vs. Oettinger,* 53 *Md.,* 63, 64; *Davis vs. Helbig,* 27 *Md.,* 466.

6. Conceding for the purpose of the argument that the County Court could sell the interests of only the parties to the cause—who were the parties? The six children of the testator, (who represented not only the estate devised to them, but also the reversion in the shares of the four life tenants of which the testator died intestate,) his widow, Elizabeth Long, and Henry Long, trustee. All other persons represented in the cause by Henry Long were also parties, as much so as if they had been parties in fact. *Calvert on Parties,* 17 *Law Library,* (*m. p.*) 74, 75; *Downin vs. Sprecher,* 35 *Md.,* 480.

· 7. As James Hutton, and James and John Wilson did not decline as "trustees," the title to the property was in the four, and Henry Long *alone* represented nothing. The mere naming of trustees does not vest them with title. Acceptance of the trust is necessary, and must be proved. There is no evidence that they accepted either directly, or by any act from which acceptance could be implied. On the contrary, there is proof in the record that none but Henry Long ever did accept. *Sangston vs. Hack,* 52 *Md.,* 187; *Hanson vs. Worthington,* 12 *Md.,* 439; *Maccubbin vs. Cromwell,* 7 *G. & J.,* 164, 165; *Armstrong vs. Morrill,* 14 *Wal.,* 138, 139.

8. The declination by the three *as executors* divested them of every interest acquired under the will, and vested the whole title in Henry Long, for the testator did not devise the estate to them as *trustees.*

9. The testator meant to devise and bequeath, and supposed that he was devising and bequeathing, the property to his four friends in the same character as that in which the powers were conferred, *i. e.* as *executors,* and not as *trustees eo nomine.* The testator gives the residue of his personal estate and all his real estate to the four in trust and special confidence for the benefit of the parties named, and in the latter part nominates the same four the executors of his will. Now while the words "in trust and con-

fidence" *do import a trust as contradistinguished from a beneficial estate* in the parties named, it is not true that they import a trust in them, as technical trustees, in contradistinction from their capacity as executors. It is well settled, of course that the same persons may be appointed executors and trustees, and that their duties and title may be distinct, but that depends in every case upon the intention of the testator, which is the cardinal rule of construction. *The intention of Kennedy Long was to vest the executors with the title to the property, and confer on · the four* AS EXECUTORS, *all the estate, all the powers, and all the duties mentioned in the will.* In the first place it will be noticed that the word "trustees" is nowhere used, and every power that would ordinarily be given to trustees is conferred upon the four as executors. While the language used in·the beginning of the will might by itself import legally that they were to take as trustees, a consideration of the whole will shows that this could not have been the intent of the testator. The EXECUTORS are ordered, and directed to rent out the dwelling place as soon as they think proper, for the benefit of the children, and the testator forbids that it be sold or leased until after the decease of his wife or until his youngest child is of age. The testator could only mean by this that the *executors* should have the property in their charge until it should be sold or leased, which, according to that clause would have been some sixteen years, as his youngest child was only five at the time of his death. The testator also desired that his children should live with their mother, provided she resided in Baltimore, during her widowhood, or as long afterwards as his EXECUTORS approved of their treatment, and that she be reasonably compensated from the income arising from their respective parts or shares. He also forbade his EXECUTORS to suffer his children, or any of them, to be sent out of the City of Baltimore to be educated. Again, he provides that the surplus income of the share

of any child under age should be invested by his EXECU-
TORS.   If he did not intend to vest the title of the prop-
erty in them as executors, why require *them* to invest the
surplus income ?

He then appoints the same four, executors, "vesting
them my said EXECUTORS with full power and authority to
divide and make partition of my estate, among those enti-
tled thereto, agreeably to this my will, or for that pur-
pose to sell, dispose of and convey the same to the pur-
chaser or purchasers, if a division cannot otherwise be
made."   The first partition contemplated by the testator
was when his son James attained the age of twenty-four
years.   The will was dated August 26, 1823, and James
was then only thirteen years old, and was only fourteen
when the testator died.   If the testator had not intended
the title of the property to vest in the four as executors,
why give these powers to them as executors, when if he
had intended them to occupy the distinct characters of
trustees and executors, these powers would properly be
exercised by them as trustees.

"And I do also," says the testator, "vest in and hereby
give the power to my EXECUTORS to make, execute and de-
liver in due form of law, all deeds, conveyances and other
instruments of writing incident and necessary to the set-
tlement of my estate."   The only deeds, &c., that they
could be called upon to make, would be in case of parti-
tion, lease or sale of the "dwelling place," which was the
only land of which he died seized and possessed, and this
he directed the EXECUTORS to rent out, and not to lease or
sell within the prohibited period.

Inasmuch, therefore, as the testator appoints no "trus-
tees" *eo nomine*, and gives no technical characterization to
the fiduciaries whom he does appoint, except that of "ex-
ecutors;" and inasmuch as all the trusts which he creates
are not only as capable of being administered by execu-
tors as by trustees, but are continually conferred on exe-

cutors and administered by them, (58 *Md.*, 203); there is
no ground for interpolating into the will a technical and
unnecessary separate trusteeship which the testator does
not create, and taking away under color thereof from the
fiduciaries named, the fee simple estate which he does
create. And it being difficult to deny that the will at
least *admits* the construction which excludes a technical
trusteeship, and unites all the fiduciary powers and estate
granted in the individuals entrusted with them, it is wholly
inconsistent with the rules of intendment applicable to
this case to exclude that construction, and thereby divest
the estates of the *bona fide* purchasers under the original
decree. In this case none but an *absolutely necessary* im-
plication is allowable against the title.

Henry Long having alone accepted the trust, the en-
tire estate vested in him. *Ratcliffe vs. Sangston*, 18 *Md.*
389; *Hill on Trustees, marg. page* 226.

10. When the same persons are named as trustees
and executors, it is as if their respective offices and duties
were conferred *on different individuals. Keplinger vs.
Maccubbin*, 58 *Md.*, 209. Should this Court, therefore, be
of opinion that it was not the intention of the testator to
vest the title in the four as executors, but that they were
to take in the distinct character of trustees, then the
word "executors," whenever it appears in connection with
the trusts and powers must be construed "trustees," for
otherwise the will would present the anomaly of title con-
veyed in trust and special confidence to one set of persons,
with all the trust duties and powers to be performed and
exercised by another set.

11. It is, of course, immaterial whether Henry Long
was designated in *Long vs. Long,* as trustee or executor,
as he will be considered as having been made a party in
every capacity, and with all the powers necessary to sup-
port the decree. *Shilknecht vs. Eastburn's Heirs,* 2 *G. &
J.,* 114, 131; *Wooten vs. Burch,* 2 *Md. Ch. Dec.,* 198; *Ridgely*

*vs. Bond*, 18 *Md.*, 450; *Faulkner vs. Davis*, 18 *Grat.*, 683; *Thompson vs. Tolmie*, 2 *Peters*, 168.

12. Henry Long represented all the estate of the contingent remaindermen.

*a.* In 1833, none of the remaindermen were *in esse.* The property having been devised and bequeathed to Henry Long, his heirs, executors and administrators, in trust, the entire estate of the remaindermen was in him at the time, and was represented by him in the case. *Fearne on Remainders, page* 304; 2 *Wash. on Real Prop.*, 511.

*b.* The testator conferred on Henry Long not merely a naked use, but an active trust during both the lives of the life tenants, and the estates of the remaindermen, which clothed him with the legal title of all of them. The trust ceases only when the active duties cease. 1 *Perry on Trusts, sec.* 330; *Sohier vs. Williams*, 1 *Curtis*, 493–4.

*c.* The devise and bequest are of the entire fee and leasehold, coupled with a power to make partition, or to sell, dispose of and convey, and this, independently of anything else, vested the entire fee and leasehold in Henry Long. *Watson vs. Pearson*, 2 *Exch.*, 580; *Bagshaw vs. Spence*, 1 *Ves.*, 144; *Gibson vs. Montford*, 1 *Ves.*, 491; *Blagrave vs. Blagrave*, 4 *Exchq.*, 569; *Cleaveland vs. Hallett*, 6 *Cush.*, 403–7; *Spessard vs. Spofford*, 9 *Gill*, 262; *Hawkins vs. Chapman*, 36 *Md.*, 94, 95; *Fisher vs. Fields*, 10 *John.*, 505.

The fee devised will not be cut down to a life estate if a power of sale is annexed. *Poad vs. Watson,* 37 *Eng. L. and Eq.* 112.

And the title conveyed will be sustained by the fee and not by the power. *Poad vs. Watson*, 37 *Eng. L. and Eq.*, 112; *Bagshaw vs. Spencer*, 1 *Ves.*, 144.

*d.* The foregoing reasoning embraces both the real and the leasehold of the "dwelling place." But as to the

leasehold, there is this additional reason why Henry Long represented the entire estate therein. The Statute of Uses does not apply to chattels real, and under the decisions of this Court, the active duties of the trustee would continue until each grandchild attained the age of twenty-one years. *Denton vs. Denton*, 17 *Md.*, 407; *Waters vs. Tazewell*, 9 *Md.*, 301; 1 *Perry on Trusts*, sec. 320.

e. The cases of *Downin vs. Sprecher*, 35 *Md.*, 479, and *Shreve vs. Shreve*, 43 *Md.*, 382, upon which the appellants rely, have no application to this case. The case of *Downin vs. Sprecher*, was distinguished by this Court from *Bolgiano vs. Cook*, 19 *Md.*, 375, because in the latter, just as in the Long case, there was a trustee *"who represented all interests, vested or contingent."* 35 *Md.*, 482. It is useless for the appellants to contend that this Court did not mean to say that the trustee represented and bound unborn children, for the paragraph on page 482, from which the above italicised words are taken, begins as follows: *" In Bolgiano vs. Cook*, 19 *Md.*, 375, all parties in interest *in being* were parties to the cause."￼ And this case is much stronger than that of *Bolgiano vs. Cook*, because here *none* of the remaindermen were *in esse* when the suit was brought and the sale made.

13. Again, the trustee, the life tenants and all the heirs-at-law of the testator who were entitled at the time to a vested estate of inheritance in fee, subject to the estate of the grandchildren who might thereafter be born, were parties to the cause, and this was all that was required according to the decision in *Downin vs. Sprecher*, where the Court holds that it is sufficient for the purposes of a sale to bring before the Court the first person in being entitled to a vested estate of inheritance. See also *Sohier vs. Williams*, 1 *Curtis*, 493–4; *Sweet vs. Parker*, 22 *N. J.*, 455–6.

14. But the case of *Long vs. Long*, is furthermore distinguishable from *Downin vs. Sprecher*, *Shreve vs. Shreve*, and from even *Bolgiano vs. Cook*, in that the will of Ken-

nedy Long contains an express power of sale, *and also an implied power to sell arising from the prohibition of a sale until after his youngest child attained the age of 21 years, or until his wife's death.* The jurisdiction of the County Court to sell the property in fee, resulted from this power. *Keplinger vs. Maccubbin,* 58 *Md.,* 203, 208–13; *Dent vs. Maddox,* 4 *Md.,* 530; *Davis vs. Clabaugh,* 30 *Md.,* 508; *Eichelberger vs. Hawthorne,* 33 *Md.,* 595–6.

15. It was not necessary that the trustee should exercise the power of sale, or assume to exercise it, or ask the aid of the Court in exercising it. The simple possession of the power made him the legal representative of the inheritance, under the rules of equity pleading. He being such representative, and a party to the proceeding, the decree of the Court was as conclusive on the remaindermen as if they had themselves been parties. All that equity requires, to bind the inheritance, is the presence of parties who represent it. The trustee was so far concluded by the decree that he could never afterwards have exercised his power of sale, and this demonstrates beyond cavil, that all which he. represented through his power, and could have done under it, passed to the vendees under the decree, and became a muniment of their title. *Creaton vs. Creaton* 3, *Sm. & Gif.* 392; *Collyer vs. Waters, L. R.,* 17 *Equity,* 265, per JESSEL, *Master of the Rolls;* 1 *Perry on Trusts, sec.* 315; *Endogan vs. Ewart,* 7 *Adol. & Ell.,* 636, 668; *Keen vs. Walbank,* 2 *Barn. & Adol.,* 562.

16. It makes no difference what is the form of the bill— relief may be granted in any character justified by the proof and the allegations. *Ridgely vs. Bond,* 18 *Md.,* 450; and the proceedings will be fortified by all possible rights and powers of all the parties to the cause and of the Court, *Faulkner vs. Jones,* 18 *Grat.,* 651, 683.

17. The prohibition by the testator of a sale of the property until the death of his wife or his youngest child attained the age of twenty-one years, is absolutely in conflict with other portions of the will.

The right of the County Court to order a sale in spite of this provision was therefore merely a question of construction or of prematureness, which affects the propriety of the decree, but not the jurisdiction of the Court. The Court had jurisdiction of the parties and of the subject-matter. A sale was prayed for notwithstanding the prohibition. The right to sell in spite of it, was, therefore, a question in the cause expressly raised, and the Court having decreed a sale, it cannot be collaterally impeached. *Raborg vs. Hammond,* 2 *H. & G.,* 50 ; *Clark vs. Bryan,* 16 *Md.,* 177 ; *Cockey vs. Cole,* 28 *Md.,* 244, 245 ; *Schley vs. Mayor, &c.,* 29 *Md.,* 46 ; *Powles vs. Dilley,* 9 *Gill,* 241; *Thompson vs. Tolmie,* 2 *Peters,* 168; *Rhoades vs. Rhoades,* 43 *Ill.,* 255 ; *Penniman vs. Sanderson,* 13 *Allen,* 193; *Rutherford vs. Clark,* 4 *Bush,* (*Ky.,*) 27 ; *Lombe vs. Stoughton,* 12 *Sim.,* 215 ; *Frith vs. Cameron, L. R.,* 12 *Eq.,* 169; *In re Lord Hotham's Trust, L. R.,* 12 *Eq.,* 76.

The presumption is that the Court did decide the question as it is directly presented in the bill. *Barnum vs. Barnum,* 31 *Md.,* 446-7 ; *Shilknecht vs. Eastburn's Heirs,* 2 *G. & J.,* 130, 131.

Presumption must be made in favor of what does not appear, and facts to aid the title may be presumed. *Shilknecht vs. Eastburn,* 2 *G. & J.,* 130, 131; *Thompson vs. Tolmie,* 2 *Peters,* 168.

18. The County Court had a right to order the sale independently of whether the remaindermen were represented, and of the prohibition in the will. Courts of chancery have power, in cases of necessity, to order a disposition of trust estates which is not in accordance with the powers of the instrument creating the trust. *Alemany vs. Wensinger,* 40 *Cal.,* 288 ; *Curtis vs. Brown,* 29 *Ill.,* 201, 228; *Bouis vs. Sloan,* 68 *Ill.,* 588; *Harvey vs. Harvey,* 2 *P. Williams,* 21; *Davis' Petitioner,* 14 *Allen,* 24, 28 ; *Frith vs. Cameron, L. R..* 12 *Eq.,* 169; *In re Lord Hotham's Trust, L. R.,* 12 *Eq.,* 76.

It would be a mockery to say that a Court, with the fact staring it in the face, as was the case here, that the entire loss of the property to all interested in possession and remainder was impending, could not, for the purpose of saving the interest of the remaindermen, do the only thing that could be done—order a sale and invest the proceeds. Such a jurisdiction must exist in a Court of equity, and the authorities cited sustain this position.

II.   The continuous, exclusive and adverse possession of the defendants under claim of title for nearly fifty years prior to the institution of this suit, is a complete bar to the claimants' right to recover. *Davis vs. Furlow's Lessee,* 27 *Md.,* 536, 545-6; *Morrison vs. Hammond,* 27 *Md.,* 604, 618; *Crook vs. Glenn,* 30 *Md.,* 55, 71, 72; *Frazier vs. Gelston,* 35 *Md.,* 314.

III.   The children of Andrew K. Long and Mrs. Knapp accepted their shares as well as their proportions of Mrs. Balfour's share of the proceeds of the sale with knowledge, and have therefore ratified the sale, and are estopped from claiming any interest in the property. *Hunter vs. Hatton,* 4 *Gill,* 124; *Maple vs. Kussart,* 53 *Pa. St.,* 353; *Duff vs. Wynkoop,* 74 *Pa. St.,* 300; *Penn vs. Heisey,* 19 *Ill.,* 300; *Lee vs. Gardner,* 26 *Miss.,* 548; *McCoy vs. Poor,* 56 *Md.,* 205.

It is well settled that where a man has sufficient information to lead him to a fact he shall be deemed conusant of it. *Smoot vs. Rea,* 19 *Md.,* 412; *Kennedy vs. Green,* 3 *Myl. & K.,* 722.

With full knowledge the parties accepted the proceeds of the sale from the trustee many years before the institution of this suit, and have not only retained it ever since, but have not even offered to return it. They have thus confirmed the sale in *Long vs. Long.*

It is not necessary, as the appellants contend, that the parties should have acted with full actual knowledge of the law as applicable to the facts. This rule applies only

to transactions between trustee and *cestuis que trust,* in which the trustee is himself interested. In all other cases ignorance of the law is no excuse, for every man is presumed to know the law and to act upon the rights it confers. *State vs. Reigart,* 1 *Gill,* 29; *Kearney vs. Sasscer,* 37 *Md.,* 279.

IV. The claimants, excepting the Worthingtons, are barred by gross laches. Lapse of time for a period shorter than twenty years will often operate as an effectual bar to a suit. *Hanson vs. Worthington,* 12 *Md.,* 418; *Hawkins vs. Chapman,* 36 *Md.,* 83; *Stearns vs. Page,* 7 *How.,* 819; *Badger vs. Badger,* 2 *Wall.,* 87; *Wood vs. Carpenter,* 101 *U. S.,* 142–3.

The complainants have not set out in their bill any reason for the delay, nor that they were ignorant of their rights, nor when they first came to a knowledge of them, and this omission disentitles the claimants, excepting the Worthingtons, to recover. *Badger vs. Badger,* 2 *Wall.,* 87; *Golden vs. Kimmell,* 99 *U. S.,* 211.

ALVEY, C. J., delivered the opinion of the Court.

The bill in this case was filed by some of the grandchildren of Kennedy Long, deceased, claiming as devisees in remainder under the will of their grandfather; and they pray for partition or sale of the property devised to them and others, and also for an account of rents and profits of the property from the parties in possession thereof.

Kennedy Long, the testator, made his will in 1823, and died in 1824. He left six children surviving him, named Andrew K. Long, James H. Long, Thomas J. Long, Eliza, who had married Dr. Balfour, (and who was a widow at the time of the death of her father,) Mary Jane Long, who afterwards married Moses L. Knapp, and Amelia Jane Long, who subsequently married Thomas Worthington. The testator also left a widow, Elizabeth Long, who survived until June, 1850. At the time of the death of the

testator some of his children were infants under the age
of twenty-one years.   He left a small personal estate, and
certain real estate, situated in or near the limits of the City
of Baltimore as then defined, and described in the will as
the "dwelling place."

As some of the questions in the case depend, to a large
extent, upon the nature and quality of the estates devised,
it is material to state, somewhat at large, the provisions
of the will.

After directing the payment of his debts and funeral
expenses, and making some few specific bequests, the
testator proceeded to give directions to his executors, after-
wards named, as to how they should dispose of and admin-
ister his personal property, and he then bequeathed to his
widow an equal share in all the remainder of his personal
estate.   And as to all the rest of his personal estate, and
as to all his real estate, of every kind and description, he
devised and bequeathed the same to his friends, James
Hutton, James Wilson, John Wilson, and his brother,
Henry Long, "and the survivors and survivor of them,
and the heirs, executors, and administrators of such survi-
vor, *in trust and special confidence,* nevertheless, for the
benefit of, and to be equally divided between, all and
every the children I now have, and the child or children I
may hereafter have, and their descendants, in manner,
upon the conditions and subject to the limitations and re-
strictions hereinafter mentioned, that is to say :"

That his son, Andrew K., during the term of his natural
life, and no longer, should receive the income of his share;
"and from and immediately after his decease, the princi-
pal of his share or proportion shall descend to, and be
equally divided between all and every the child or children
of him, the said Andrew K., their heirs, executors, ad-
ministrators and assigns, in equal proportions, as tenants
in common, share and share alike."

That his sons Thomas and James, respectively, until
the latter should attain the age of twenty-four years,

should receive, or have applied to their respective uses, the rents, &c., of their respective shares, and upon James attaining that age, he and Thomas should be put into possession of, and receive the principal of their respective portions, to hold to them respectively, and their respective heirs, executors, administrators or assigns forever, in severalty.

That his daughters, Eliza Balfour, Mary Jane Long, and Amelia J. Long, should, during their respective lives, take, receive and enjoy, or have applied to their several uses and benefits, the dividends, rents, issues, profits and income of their respective portions or shares, free from the control and liability for the debts of their husbands; "and from and immediately after the decease of my said daughters, respectively, the principal share or portion of her so dying, shall descend to, and be equally divided between all and every her child or children, their heirs, executors, administrators and assigns, forever, as tenants in common, in equal proportions, share and share alike. And in the event of the decease of any of my children *under age*, and without lawful issue, the share or proportion of him, her or them, so dying, shall descend to and become the estate and property of the survivors or survivor of them, my said children."

The testator further provided and declared, that it was his will and desire, and he so ordered and directed, that his "dwelling place" be rented out as soon as his executors might think proper, for the benefit of his children; "and I do expressly forbid that any part or parcel of that property be either sold or leased until after the decease of my beloved wife, or until my youngest child is of age; and it is also my desire that my children live with their mother, provided she reside in Baltimore, during her widowhood, or as long afterwards as my executors approve of their treatment, and that she be reasonably compensated from the income arising from their respective parts of my estate, for her trouble and attention to them."

The testator then nominated and appointed as his executors and as guardians of his children, the same four persons to whom he had, in a previous part of the will, devised and bequeathed his estate in trust; and as executors he invested them "with full power and authority to divide and make partition of my estate among those entitled thereto, agreeably to this, my will, or for that purpose to sell, dispose of and convey the same to the purchasers, if a division cannot otherwise be made. And I do also vest in and hereby give the power to my executors to make, execute and deliver, in due form of law, all deeds, conveyances and other instruments of writing incident and necessary to the settlement of my estate. And in the event of the decease or refusal to act of either of my said executors, I give to the survivors or survivor, or acting ones of them, all the power and authority given to them jointly, freely committing to them the management of my earthly concerns, having the uttermost confidence in their integrity."

The widow renounced the provisions of the will in her favor, and elected to take what the law allowed her instead. James Hutton and the two Wilsons declined to act as executors, and though there is no formal evidence of disclaimer, it does not appear that they ever accepted the trust conferred upon them by the will, or that they ever interfered with the estate in any way whatever, and all the circumstances of the case concur in making it clear beyond doubt that they never did in fact accept the trust.

Henry Long, therefore, became the sole trustee, and also the sole executor. And the principle is clear that where some of the trustees disclaim or decline to accept, in a case like the present, the remaining trustees or trustee will take not only the entire legal estate devised or granted, but also all the powers and authorities intended that they should exercise as trustees, and which are requisite for the execution of the trust. *Small vs. Marwood*, 9 *B. &*

*Cr.,* 300; *Nicholson vs. Wordsworth,* 2 *Swanst.,* 365; *Watson vs. Pearson,* 2 *Exch.,* 581, 594; *Hill on Trust.,* 226.

As sole executor Henry Long proceeded in the settlement of the personal estate, and the distributive share of each child was ascertained to be about $1200. The only remaining property subject to the trusts of the will was the "dwelling place," which the testator had forbidden to be sold or leased, until after the death of his wife, or until his youngest child should come of age. As long as Henry Long remained in the State he superintended this property as executor and trustee; but shortly after the settlement of the persoual estate he removed to the State of Illinois, where he became a permanent resident. From the time of his removal there was no person present to exercise supervision over the property, and it was suffering serious detriment for the want of proper management.

In this state of things in March, 1833, the widow, and all the children of the testator, the devisees under the will, except Amelia J. Long, who was still under age, joined in a petition to the County Court of Baltimore County, a Court of general equity jurisdiction, representing the facts of the case, and praying that Henry Long, the trustee, be removed, that some other person be appointed in his stead, and that the "dwelling place," the only real estate left by the testator, be sold, and that the proceeds of sale be paid to the parties entitled; and the will of the testator was made an exhibit with the petition. Amelia Jane Long, the infant, and Henry Long, the trustee, were made parties defendants. Henry Long answered, admitting the facts alleged, and consented to his own removal, and the appointment of some other person in his place. He did not, however, join in the application for the sale of the property, nor did he admit that a sale was wise or proper. He was silent upon the subject. The infant defendant answered by her guardian, admitting

the facts, and consented to a sale. Whereupon a commission was issued out to three disinterested freeholders, to view the premises and report to the Court whether it would be for the interest and advantage of the infant, and *all the parties concerned,* that a sale should be made of the property in the proceedings mentioned. The commission was executed and returned, and in their report, the commissioners represented the condition of the property as bad, with a prospect of its becoming much worse. They reported that the property was yielding but small rent, and they strongly recommended a sale of it, as being to the decided advantage of all the parties concerned. They valued the property at $5,000. Thereupon the Court, on the 8th of April, 1833, passed its decree; and after reciting that it appeared to the Court that the property had suffered from the neglect of the trustee, and further "that it would be for the interest and advantage of said infant, and all persons concerned," that the property should be sold, it proceeded to decree that Henry Long be removed from his position as trustee, and that Josias Pennington be appointed in his stead, to execute the trusts created by the will; and it further decreed that the property be sold by the new trustee thus appointed. The decree required the proceeds of sale to be brought in to be distributed under the direction of the Court; and, upon full payment of the purchase money, the trustee was authorised and directed to make to the purchaser a good and sufficient deed, conveying to such purchaser the property sold, "free, clear and discharged from all claim of the parties to the cause, complainants and defendants, and those claiming by, from or under them, or either of them." The new trustee, some short time after the decree, filed his bond and assumed the duties of the trust. He sold the property for $5,500, and the sale was reported to and ratified by the Court; and the purchase money having been paid, the deed was made to the pur-

chaser in pursuance of the decree. Auditor's accounts. were stated and the proceeds of sale distributed; and the distributive shares of the devisees for life were audited to the trustee, to be invested by him under the order of the Court, for the benefit of the tenants for life, and for the benefit of those in remainder after the death of the life-tenants. By the order of ratification, of the 16th of December, 1833, the trustee was directed "to pay over the amounts now due and payable to the several parties respectively entitled thereto, and to invest in his name as trustee,,etc., the amounts thereby appearing to be due to the several parties for whom he is directed to hold the same in trust;" and he was required to give bond for the faithful performance of that duty. The amounts distributed to James H. Long and Thomas J. Long were paid over to them directly, they being entitled absolutely under the will; but the other shares were invested as directed by the Court. The interest on these shares thus invested was paid over by the trustee to Andrew K. Long, Mrs. Balfour and Mrs. Knapp during their respective lives, and to Mrs. Worthington until 1877, from which time she refused to receive it.

Mrs. Knapp died in 1863, leaving six. children, and all of them received their proportions of the share of the proceeds of the sale of the property invested for their mother for life, under the order of Court, as appears from certain entries of the trustee, and releases to him dated in 1863 and 1868. Andrew K. Long died in 1866, leaving six children, and the share of the proceeds of the property sold that was invested for him for life, has been divided and paid over to his children by the trustee, as is evidenced by the receipts and releases to the trustee, dated in 1870. Mrs. Balfour died in 1870, without issue, and the share of the proceeds of sale invested for her during life, has been paid over, so far as shown, to those entitled to receive it. Mrs. Worthington died in 1881, since the filing

the bill in this cause, leaving eight children surviving her, three others having died in her life-time. The share of the proceeds of sale that was invested for Mrs. Worthington for life, and for the benefit of her children after her death, remains in the hands of the trustee, the children declining to receive it.

The bill in this case was filed the 1st of June, 1880, by the children of Andrew K. Long; the children of Mrs. Knapp and of Mrs. Worthington being made defendants; but after the death of Mrs. Worthington her children were joined as plaintiffs.

The bill proceeds upon the theory and assumption that the estates limited in remainder to the children of Andrew K. Long, Mrs. Knapp, and Mrs. Worthington, in the property described as the "dwelling place," were not disposed of or in any manner converted, by the sale under the decree of Baltimore County Court, in 1833; and those children are now claiming their respective interests in that property as if no sale had ever been made.

The numerous defendants, being owners and occupants of the property, by their answers, have set up various defences; first, that the decree and sale of 1833, operated upon, and transferred to the purchaser, the entire right and estate, of which the testator died seized, in the property sold; secondly, that the claim of the plaintiffs is barred by the Statute of Limitations; third, that the claim is barred by lapse of time and *laches*; and fourth, that the claim on the part of the children of Andrew K. Long and Mrs. Knapp is entirely concluded by acquiescence and ratification.

1. With respect to the jurisdiction and power of the County Court to pass the decree, under which the sale was made, we can entertain no doubt. The clause of the will forbidding the sale or lease of the property until the occurrence of certain events, did not affect the jurisdiction of the Court. The Court was one of general equity juris-

diction, and the subject-matter and the parties fell within
the scope and limit of that jurisdiction. The object
of the application was, in the first place, to have
one trustee removed and another appointed in his
stead; and, in the second place, to have real prop-
erty that was held in trust sold for the interest and com-
mon benefit of all parties concerned. These were objects
clearly within the jurisdiction of the Court; and while it
may have been error to authorise the sale, in view of the
special provision of the will, yet that was matter of con-
struction upon which the Court was competent to pass,
and for any error committed in that respect, the proper
remedy was either by bill of review in the same Court, or
an appeal to a Court of review. The general and well
settled rule of law in all such cases is, that when the pro-
ceedings are collaterally brought in question, and it
appears on their face that the subject-matter was within
the jurisdiction of the Court, they are not impeachable
for mere errors or irregularities that may be apparent.
Such errors and irregularities must be corrected by some
direct proceeding, either in the same Court to set them
aside, or on appeal. If, however, there be a total want of
jurisdiction, either of parties or subject-matter, the pro-
ceedings are void and can confer no right, and will be
rejected, though the objection to them be taken in a col-
lateral proceeding. But where there was jurisdiction in
the Court, the erroneous or improvident exercise of it, or
the exercise of it in a manner not warranted by the evi-
dence before it, whether that be in respect to the construc-
tion of written instruments, or deductions drawn from
unwritten proof, the errors, however apparent, are not to be
corrected at the expense of the purchaser, who had a right
to rely upon the order of the Court, as an authority ema-
nating from a competent jurisdiction. The County Court
having jurisdiction over the subject-matter and the parties,
it had a right to decide every question that arose in the

cause, and whether the decision be right or wrong, it must be respected by all other Courts when coming collaterally in question. Any other principle would unsettle and render insecure the larger portion of the titles of the country. This Court, in common with the other appellate Courts of the country, has repeatedly asserted these principles to their fullest extent. *Hunter vs. Hatton,* 4 *Gill,* 115; *Clark & Jackson vs. Bryan,* 16 *Md.,* 174; *Cockey vs. Cole,* 28 *Md.,* 244, 245; *Schley vs. City of Baltimore,* 29 *Md.,* 46; *Thompson vs. Tolmie,* 2 *Pet.,* 157; *Voorhees vs. Bank U. S.,* 10 *Pet.,* 449; *Comstock vs. Crawford,* 3 *Wall.,* 396; *Hall vs. Law,* 102 *U. S.,* 461.

The decree, therefore, of the County Court, made in 1833, bound all the parties to the cause, to the full extent of their rights and interests in the property, whether legal or equitable, and the sale and the conveyance by the trustee transferred to the purchaser all the right, estate and claim of the parties to the cause, existing at the date of the decree. It was with the entire interests and estates of the parties that the decree dealt, and hence the trustee was directed to sell and convey the property and estate "free, clear, and discharged from all claim of the parties, and those claiming by, from or under them, or either of them." The devise to Mrs. Balfour was for her life only, with remainder to her children, and in the event of her death under age *and* without lawful issue, the share so devised was given over to the surviving children or child of the testator ; but there was no disposition made of this share in the event of the devisee for life dying *after* attaining age and without issue. And as Mrs. Balfour was over twenty-one years of age at the time of the application for sale, and died in 1870, without issue, it follows that there was an intestacy in respect to this share, and a reversion in fee vested in the heirs-at-law of the testator at the time of his death ; and as all these heirs-at-law were parties to the cause in which the decree passed,

this reversionary estate passed to the purchaser. *Neale vs. Cosden*, 34 *Md.*, 421, 426; *Heald vs. Heald*, 56 *Md.*, 300.

But the most material question in this case is, whether the children of Andrew K. Long, Mrs. Knapp and Mrs. Worthington, entitled in remainder under their grandfather's will, were substantially and legally represented, so as to be bound thereby, in the proceedings that resulted in a decree and sale of the property, though they were not *in esse* at the time. To determine this question, we must ascertain what estates were given by the will, and their connection and dependence the one upon the other.

Looking to the context and the whole scheme of the will, it would seem to be quite manifest that the testator intended that his son Andrew K. Long, and his three daughters, should take equitable life estates only, and that the trustees should hold the legal estate during the respective lives of these children of the testator. The use therefore was executed in the trustee and his heirs, during the respective lives of these life tenants, and not in the life tenants themselves. *Ware vs. Richardson*, 3 *Md.*, 505; *Griffith vs. Plummer*, 32 *Md.*, 74; *Hapland vs. Smith*, 1 *Bro. C. C.*, 75; *Doe vs. Hicks*, 7 *T. Rep.*, 433, 437; 1 *Perry on Trusts*, sec. 305. But with respect to the devises in remainder to the grandchildren, it is declared that from and immediately after the death of the parent, the equitable life tenant, the principal of his or her share shall descend to and be equally divided between all and every the child or children of such life tenant, their heirs, executors, administrators and assigns, in equal proportions, *as tenants in common, share and share alike.* This language gives an absolute, uncontrolled estate, and it does not import that the children were to take through their parents by descent, but they take as purchasers by way of devise. And such being the case, it would seem to be clear that the devisees in remainder take legal estates,

and not equitable estates as did the devisees for life. *Ware vs. Richardson*, 3 *Md.*, 507, 554; *Griffith vs. Plummer*, 32 *Md.*, 74; *Shreve vs. Shreve*, 43 *Md.*, 382. There is no active duty or exercise of discretion whatever required of the trustees in respect to these devises in remainder. The direction that the shares so given in remainder shall be equally divided means nothing more than that each child of the several tenants for life shall have an equal interest in the share devised to his or her class in remainder. It required no active agency of the trustees to ascertain such interests; the language and form of the devise being that most usually employed in devises and bequests to several parties, intended to be equally benefited, and where no trustees are interposed. Each set or class of devisees in remainder take as tenants in common, share and share alike. Therefore, though the devise to the trustees was to them and their heirs, and thus in terms giving them an estate of inheritance in the realty, yet the trust created was not required for any practical or useful purpose beyond the lives of the equitable life tenants; and it is not to be supposed that the testator intended that the trust should continue through all generations. The principle is now firmly settled upon the most indubitable authority, that the extent of the legal interest of a trustee in an estate given to him in trust is measured, not by words of inheritance or equivalent terms, but by the objects and extent of the trust upon which the estate is given. Or, as the proposition is in other words stated, "although a legal estate may be limited to a trustee to the fullest extent, as to him and his heirs, yet it shall not be carried farther than the complete execution of the trust *necessarily* requires." 1 *Perry on Trusts, sec.* 312; *Doe vs. Hicks*, 7 *T. Rep.*, 433, 437; *Doe vs. Simpson*, 5 *East*, 163; *Player vs. Nichols*, 1 *B. & Cr.*, 342; *Webster vs. Cooper*, 14 *How.*, 488, 499; *Young vs. Bradley*, 101 *U. S.*, 782. And in regard to the personalty, the principle is, that when a trust

has been created, and all the purposes of the trust have ceased, or are at an end, the absolute estate is in the person entitled to the last use, unless there is an apparent intention to the contrary. *Rice vs. Barnett,* 1 *Speer's Eq. Rep.,* 579; *Denton vs. Denton,* 17 *Md.,* 403; 1 *Perry on Trusts, sec.* 311.

Nor can the powers confided to the same persons as executors as those to whom the estate was devised in trust, be invoked to enlarge the estate or powers of the trustees. The fact that the same party is both trustee and executor cannot operate to enlarge his powers in either capacity, nor can it work any transfer or interchange of powers. In such case the will must be construed as if the respective offices and duties had been conferred upon different persons. *Keplinger vs. Maccubbin,* 58 *Md.,* 203. In this case the powers conferred upon the executors, of partition or sale, were never attempted to be exercised; and, of course, no title can be derived or supported through such powers.

Now, seeing that the trustee held the estate in trust only for the lives of the first devisees, the question is, how were the devisees of the legal estate in remainder represented in the proceedings for the sale? As before stated, they were not then *in esse,* and therefore the estates devised to them were but contingent remainders. The Court, and the parties before the Court, proceeded as if it was a right and proper thing to do for the interest of all concerned, to convert the estate into money, and to let the fund stand in the place of the property sold. If, however, that was done without warrant or authority of law, as to parties ultimately entitled, and the estate of such parties has been illegally sold by a judicial proceeding to which they were no parties, and had no legal representation therein of their interests, then, though it may operate a great surprise and hardship upon innocent parties, the Courts have no alternative but to uphold the rights of

those whose interests have been thus illegally dealt with. Upon what principle, then, can it be maintained that these plaintiffs have been legally divested of their property by the decree and sale of 1833, as the law stood at that time? as since that time provision has been made for such cases by statute: Act of 1868, ch. 273. It would seem to be clear, upon the plainest principles, that if some one of the real or substantial parties to the cause did not hold such relation to the property, and to these plaintiffs as contingent remaindermen, as made him a legal representative of the inheritance, so as to bind it by recovery against him, these plaintiffs were not represented in that proceeding, and are therefore not bound by the decree. The widow of the testator was a party, but she had only the interest of an unassigned dower in the real estate of her husband. The children of the testator, holding equitable life estates in the shares that were devised to the grandchildren in remainder, were parties, but they did not, certainly, as devisees, represent the inheritance; and the acting trustee, holding the legal estate in the freehold only for the lives of the equitable life tenants, with no powers, in his character as trustee, to enable him to sell or convert the real estate into money, clearly could not legally represent those entitled in remainder to the inheritance, as the law then existed. It is true, the heirs-at-law of the testator, who were parties to the cause, held the legal fee in the shares of the realty devised to the grandchildren in remainder until those grandchildren should come into being, or until the death of their parents without issue. But it is a settled principle, that where a person is seized in fee of an estate which is liable to be defeated by a shifting use, conditional limitation, or executory devise, the inheritance is not represented in a Court of equity by the person who has the fee thus liable to be defeated, except as against himself and those who take under him. *Goodess vs. Williams*, 2 *Y. & Coll., N. R.*, 595. And the reason of that

principle applies here in all its force.  It follows, there-
fore, that the inheritance, the fee simple estate in remain-
der, as to the 'present claimants, was not represented by
any competent party to that proceeding.  There was no
*prior* estate of inheritance *taken under the will,* and there-
fore there could be no representation of those contingently
interested in any *subsequent* estate which would be liable
to be defeated by a recovery of such first estate of inherit-
ance.  The case falls fully within the principle of the cases.
of *Downin vs. Sprecher,* 35 *Md.,* 474 ; *Shreve vs. Shreve,*
43 *Md.,* 382, and *Timanus vs. Dugan,* 46 *Md.,* 402, and
those cases must control the decision of the question here
presented.

What we have said in regard to the want of representa-
tion in the sale of the property, only applies to the real
estate as such, and not to any personal or leasehold estate.
In regard to the latter, the trustee held the legal estate
until the trust was ended by the termination of the lives·
of the life tenants ; and he was the sole representative of
that estate.  Being a party to the decree whereby the
leasehold interest was ordered to be converted into money,
those entitled in remainder, especially as they were not *in
esse* at the time, are bound and concluded by the decree.
1 *Perry on Trusts, secs.* 311, 318, *and* 330, *and cases cited.*

2. Having disposed of the question as to the effect of
the decree and sale upon the interests of the parties claim-
ing in remainder, we come next to the defence of the
Statute of Limitations relied on by the defendants.

If this were an action at law, as perhaps properly it
should be, instead of a bill in equity, it is very clear that
the Statute of Limitations as a technical bar could have no
application as against the right to recover the estate
itself, though it would have against the claim for rents and
profits.  The supposition that the legal fee of the estate
remained in the trustee, and that the holding. of the de-
fendants was adverse to him as the representative of the

·estates in remainder, we have shown to be unfounded. The defendants claim the title that was conveyed by the trustee's sale and deed of 1833, and by that sale the pur-·chasers acquired at least all the right and title of the ·several devisees for life, including the legal estate held by the trustee. It was not therefore until the termination of the life estates, that the parties so claiming and holding ·could be regarded as holding by wrong as against those in remainder. In other words, the remaindermen in fee had no right of entry until the previous equitable life ·estates, protected by the legal estate in the trustee, had ·expired. *Preston vs. Evans,* 56 *Md.,* 476; *Jackson vs. Schoonmaker,* 4 *John.,* 390. And it has been deliberately held by this Court, that a Court of equity in applying the ·Statute of Limitations analogically, as to the right of entry, will not permit the claim of a party to be affected by any ·devolution of time short of that which would have barred him at law in an action of ejectment. *Dugan vs. Gittings,* ·3 *Gill,* 138, 161; *Needles vs. Martin,* 33 *Md.,* 619. Mrs. Knapp died in May, 1863, Andrew K. Long in August, 1866, and Mrs. Worthington since the filing the bill in this ·cause, which was on the 1st of June, 1880; and conse-·quently the twenty years since the right of entry accrued had not expired, as to any of the parties claiming, at the time of the institution of the suit.

3. The defendants also rely upon *laches* and lapse of time, as distinct from the defence of the Statute of Limi-·tations, as against the claims of the children of Andrew K. Long and those of Mrs. Knapp. But we do not think, ·on the facts of this case, that that defence, standing alone, ·ought to prevail. Lapse of time, however, may have a very considerable influence when considered in connection with the defence made in this case, of estoppel and ratifi-·cation, next to be noticed.

4. The defendants have produced the account of the ·trustee, Mr. Pennington, showing the state of the family

of Col. Kennedy Long, the amount of the funds in his hands as trustee, realized in part from the sale of the real estate under the decree of 1833, and to whom and when paid over; and this account, and the entries therein of payments and disbursements to the several children and descendants of Kennedy Long, are admitted to be correct; and the trustee being dead, it is agreed that the account shall be accepted as evidence. The defendants have also produced and rely upon certain receipts and releases to the trustee, Mr. Pennington, by the children of Andrew K. Long and Mrs. Knapp, for their shares or proportions of the proceeds of the sale of the property, which had been invested under the order of the Court for their use; and it is insisted that the reasonable legal effect of such evidences of receipts of payment and release is to work a ratification of the sale by which the fund was produced. The receipts and releases produced embrace the entire share set apart for Andrew K. Long and his children; and all the children left by Mrs. Knapp, except Mrs. Hageman and Moses L. Knapp, appear to have given similar receipts and releases upon the receipt of their proportions of the share set apart for their mother and her children. The record does not contain a release from Mrs. Hageman, one of the children of Mrs. Knapp, though the account of the trustee, admitted to be correct, shows that she received her proportion of the fund, as did the other children. It is not unreasonable therefore to suppose that she executed to the trustee a release similar to those executed by her sisters. Moses L. Knapp, the only son of Mrs. Knapp, died in 1874, under age and intestate.

It is contended for the plaintiffs that before these receipts and releases should be allowed to have the effect claimed for them, the Court should be satisfied that the money was received and the releases were given with full knowledge of all the facts, and with an understanding by the parties of their legal rights in respect to the subject-

matter. This is certainly correct as a principle. But is the Court to assume, in the total absence of anything to the contrary, upon which reliance can be placed, that there was either ignorance of fact or want of knowledge of legal rights, on the part of the parties receiving the money and executing the releases, in order to avoid the legal consequences that might otherwise result therefrom? The releases are quite full in their reference to the source and origin of the fund. It is impossible to suppose that any intelligent person could sign such releases without knowledge of the manner in which the fund was derived. Indeed, the strong inference is, from the whole history of the case, that these parties understood perfectly well what had been done in regard to their grandfather's estate. What had been done in converting the realty into money was a family transaction, and it was instigated and procured by the parents of some of the parties now complaining. They knew certainly of their grandfather's will, and they doubtless knew that the "dwelling place," left to the family as a home, had been sold. They knew and recognized in Mr. Pennington the character of trustee, and that he held that character under the decree of Baltimore County Court. And with this knowledge, if they had not been disposed to acquiesce in the conversion of the property, they should have declined accepting the money from the trustee, and asserted their claim to the property without unreasonable delay. It would certainly be against equity and conscience to allow them to receive the money and also to recover the land for which the money was paid. That could not, upon any principle, be allowed. Having made their election to receive the money, they must be taken to have ratified the sale by which the money was, in part, produced. And that the sale was originally void, as to them, can make no difference; for it is now perfectly well settled that sales either voidable or void may be ratified by the acts of the parties in interest. They may

be ratified, either directly, or by a course of conduct which will estop the party from denying their validity; and especially so in a Court of equity. And without citing all the cases upon the subject, we may refer to *Hunter vs. Hatton,* 4 *Gill,* 124; *Stroble vs. Smith,* 8 *Watts,* 280; *Smith vs. Warden,* 19 *Penn. St.,* 429; *Maple vs. Kussart,* 53 *Penn. St.,* 348; *Duff vs. Wynkoop,* 74 *Penn. St.,* 300; *Lee vs. Gardiner,* 26 *Miss.,* 548.

As to the claim of Mrs. Hageman, one of the children of Mrs. Knapp, while there is no formal release exhibited from her, it is admitted that she has received her proportion of the share of the proceeds of sale set apart to her mother for life; and there is no reason why she should not be equally estopped as the other of her sisters. Even if she never did execute a formal release, she and her husband were competent to become parties to a proceeding for the sale and conversion of the property; and if they thought proper to adopt a previous sale and to take the proceeds in lieu of the property itself, they were at liberty to do so, and their election will bind them. *Kempe vs. Pintard,* 32 *Miss.,* 324; *Hunter vs. Hatton,* 4 *Gill,* 124.

But with respect to Moses L. Knapp, the minor son of Mrs. Knapp, he having died in 1874, before he attained age, the case is different. He was not competent himself to do any act that would have the effect to ratify the sale, nor could any one else ratify it for him during his minority. No act done or sanctioned by his guardian, especially a foreign guardian, could have the effect to ratify the sale or conversion so as to bind him, except at his election after he became of age. And having died a minor, leaving his interest in the real estate unaffected by ratification of the sale made under the decree in 1833, that interest devolved upon his five sisters, and such devolution of interest was long after the receipts and releases by the sisters for their respective shares of the fund in the hands of the trustee. Such surviving sisters therefore of Moses L. Knapp are

entitled as his heirs-at-law, to the one-sixth of one-sixth of the real estate sold under the decree of 1833; and this new right devolved upon the sisters is in no way affected by the receipts and releases previously given by them for their respective portions of the fund to which they were entitled as devisees under their grandfather's will. It has been suggested that the surviving children of Mrs. Knapp are not in a position in this case to take the benefit of this new inheritance from the deceased brother, by any decree that could be properly passed upon the present bill; but in this we cannot concur. The bill was filed against the children of Mrs. Knapp as tenants in common with the complainants, for partition or sale of the common property, and was therefore for the benefit of them all. The surviving children of Mrs. Knapp answered the bill, admitted the facts alleged, and consented to a decree as prayed. They ought not, therefore, to be prejudiced by the position they happen to occupy upon the record. The bill in the Court below was dismissed with costs; and being defendants, the Knapp children were in no position to appeal; and an appeal on their part, in such case as this, was not necessary to save their rights. *Hanson vs. Worthington,* 12 *Md.,* 418, 443.

It has been suggested on the part of the complainants, that the payment by the trustee of the share or portion due to William St. Clair Long, one of the children of Andrew K. Long, deceased, and the release to the trustee by the curator of the estate of the devisee, could not have the effect of ratifying or confirming the sale of 1833, because William St. Clair Long was a minor, under twenty-one years of age, at the time of such payment by and release to the trustee; and this would be correct were it not for the lapse of time since the devisee, William St. Clair Long, attained the age of majority. The payment and release were both made in 1870, and William St. Clair Long attained the age of twenty-one years in

1871; and as it has not been pretended that he did not receive the money, the rational presumption is that he received it upon attaining the age of majority, with know-ledge of the source whence it was derived. He is, there-fore, with the rest of the children of Andrew K. Long, estopped to question the validity of the sale of 1833.

There being no question of estoppel or ratification as to the children of Mrs. Worthington, they, or those repre-senting them, are entitled to one-sixth part of the real estate sold under the decree. They have received no part of the proceeds of sale, and have positively refused to recognize the validity of the proceedings under which the sale was made.

The bill prays for an account of rents and profits. The Statute of Limitations is relied on as a bar to that relief; and as to the one-sixth of one-sixth interest, to which alone the statute can have any application, the account will be confined to the period of three years prior to the filing the bill, and down to the time of accounting; and as to the one-sixth interest the account will be taken from the time of the death of Mrs. Worthington.

The defendants who claim and hold the property under the decree and sale of 1833, being innocent *bona fide* holders and possessors of the property in controversy, supposing that they held a good and sufficient title thereto by virtue of a judicial sale, will be entitled, upon well established principles, to a proportionate allowance for the value of all beneficial permanent improvements of the property, according to its present improved condition. They will also be entitled to a proportionate allowance for all such taxes and insurance as may have been paid by them, for the time during which they are required to account for rents and profits. This right to allowance we do not understand to be controverted. Indeed, it is conceded that such would be the consequence of a decree for the plaintiffs.

It follows that we must reverse the decree appealed from, and remand the cause that a decree may be made in accordance with the foregoing opinion.

*Decree reversed, and*
*cause remanded.*

(Decided 27th March, 1884.)


BRYAN, J., delivered the following dissenting opinion:

The solicitors of the respective parties, filed in the Court below an agreement, waiving all objections to its jurisdiction to grant the relief prayed in this cause. It is, therefore, our duty to decide the questions presented by the record, even if we should think that they are more properly of legal cognizance. I purpose to consider the effect of the decree of Baltimore County Court, passed at April Term, 1833. The petition, on which the decree was founded, is aptly drawn according to the provisions of the Act of 1782, ch. 72, sec. 12, and is also embraced within the general jurisdiction of equity. Two of the parties to the proceeding, James H. Long and Thomas J. Long, had fee simples in their shares of the real estate in question; the other children of Kennedy Long had equitable life estates in their portions; and the widow had a dower interest in all of the fee simple property; while the reversion in fee descended to all the children of Kennedy Long as his heirs-at-law, subject to be defeated (so far as the portions were concerned which belonged to the equitable life tenants,) by the birth of children to them. Henry Long was also a party to the proceeding, appearing as a defendant. Now Henry Long was the only one of the devisees in trust who accepted the trust, and the only one of the executors who took upon himself the execution of the will. For the reasons stated in the opinion of the Court, it is clear that as devisee he took only an estate *per autre vie;* but as acting executor, he

was invested with full power and authority to divide and make partition of the testator's estate among the persons entitled to it under the will, and for that purpose to sell, dispose of, and convey the same to the purchaser or purchasers, if a division could not otherwise be made. The will also in terms gave him power as acting executor, to make, execute and deliver in due form of law, all deeds, conveyances and other instruments of writing, incident and necessary to the settlement of the estate ; and freely committed to him the "management of the earthly concerns of the testator." These different duties and powers having been conferred on Henry Long in different capacities, we must, according to the authorities, treat them as if they were to be executed by different individuals, although it is not easy to believe that it was actually the intention of the testator, that there should be such a division of responsibility. Now the distinct object of the petition was to procure the sale of this property, which Henry Long was authorized to make. It is settled in the case of *Keplinger vs. Maccubbin*, 58 *Md.*, 203, that no one but Henry Long could make the sale, unless he should choose to waive his right. The petition prays for his removal, and the appointment of some person in his place as trustee, "to carry into effect and execution the trusts and appointments of Kennedy Long's will," and avers that the application was made at Henry Long's suggestion and request. In his answer, Henry Long states that he had removed from the State of Maryland, and was consequently unable to give such attention to the property as he wished, and as it required. His answer then proceeds in these words: "Having the interests of the petitioners at heart, he would not be willing to cause injury to their property by any act of his, and therefore joins them in their application to this honorable Court, for an order appointing some one whom they may nominate and choose in the place, and with all the power

and authority of this respondent, and revoking and annulling all power and control of this respondent, in and over the trusts created by the will of said Kennedy Long." Now bearing in mind that the object of the petition was to procure a sale of the property, and that by the will of Kennedy Long, the respondent was the proper person to make the sale, we cannot fail to see that he intended by his answer to relinquish this power, and to sever himself from all connexion with the property mentioned in the will. The Court evidently considered him as abnegating his duties and powers; for it states in the decree that his refusal and neglect to bestow proper attention on the estate of Kennedy Long was productive of loss and injury to the infant, and the other *cestuis que trust;* and it proceeds to decree that the property should be sold. In these proceedings, process is prayed against Henry Long, without attaching to his name any designation either as trustee, or as executor, and he makes his answer without any such designation. But, surely, the absence of such an addition could be of no importance, where it clearly appeared that the object of the proceeding was to divest him of the power and authority which he had derived from the will in question, and to invest some other person with it.

The decree distinctly appoints Josias Pennington to *"execute the trusts created by said will."* It cannot be questioned that the "power and authority to sell" was a trust in the strictest and most technical sense. It was so considered by this Court in *Keplinger's Case;* and it was there decided that previously to the Act of 1865, chapter 162, where an executor declined to execute such a power as this, it was competent for a Court of equity to sell and convey the property, according to the provisions of the fourth section of the Act of 1785, chapter 72. 58 *Md.*, 211. That section is in these words: "That if any person hath died, or shall die, leaving real or personal estate to be

sold for the payment of debts or other purposes, and shall
not, by will or other instrument in writing, appoint a per-
son or persons to sell or convey the same property, or if
the person or persons appointed for the purpose aforesaid
shall *neglect or refuse to execute such trusts,* or if such
person or persons, or any of them shall die before the exe-
cution of such trust, so that the sale cannot be made for
the purposes intended; in every such case the Chancellor
shall have full power and authority, upon application or peti-
tion from any person or persons interested in the sale of
such property, to appoint such trustee or trustees for the
purpose of selling and conveying such property and apply-
ing the money arising from the sale to the purposes intended,
as the Chancellor shall in his discretion, think proper."
It will be seen that the Act does not require all persons
interested in the sale to join in the petition; but that the
substitution of a new trustee may be made on the appli-
cation of any one or more of them. The new trustee
might have sold the property without obtaining any de-
cree from a Court of equity; and in case the sale had
afterwards been called in question, it would have been
upheld by the Court, even if not made under the precise
circumstances specified in the will, provided the sale was
such as the Court would have decreed, upon a proper appli-
cation, for the purpose. For it is a rule without excep-
tion that equity will ratify any act when done, if it would
have previously ordered it. A sale by the new trustee,
made when the proper occasion arose, would have conveyed
all interests in the property, present and future, vested
and contingent. It was manifestly contemplated by the tes-
tator that the sale might be made before the birth of any
grandchildren, because the only restriction made on the
sale is, that it must not be made before one of two events
should happen, to wit: the death of the testator's wife, or
the arrival at age of his youngest child; and both of these
events, in the ordinary course of things, might occur be-

fore any grandchildren were born. The difference between a sale by the trustee in the exercise of his own judgment, and one made under a decree of the Court is this: if he made it without first obtaining a decree of the Court, he would be obliged to establish to the satisfaction of the Court that circumstances justified the exercise of his power; whereas, on application to the Court, the propriety of the sale would be determined before a decree was made. In this instance the Court was satisfied (to quote the language of the decree,) that it was "for the interest and advantage of said infant, and all persons concerned, that the said country place should be sold." And all the owners of the entire fee simple (in the then condition of things) were before the Court; and all those who were *sui juris*, were earnestly asking that the property should be converted into money. It is true that the interests of Andrew K. Long, and of the daughters of the testator were liable to be diminished if children should thereafter be born to them. Such children would take interests in the property in defeasance of the estates of their parents. The property was going to ruin, and its conversion into money was required for the benefit of those who might in any future contingency become interested in it, as well as for the benefit of those who were then the sole owners. Is there any rule founded in reason, or in justice, or in the practice of equity, which required the Court to refuse its aid to these owners? Was the Court obliged to stay its hand and let the property go to ruin, simply because in some future contingency, (which in point of fact might never occur) other persons, not then in existence, might have an interest in it? If this be so, the jurisdiction of equity is most abortive and impotent. A rule so unreasonable and so pernicious ought not to be tolerated, unless it be sustained by an irresistible weight of authority. Now, I maintain that there is no such rule. I maintain that the sale in question carried every interest in the prop-

erty; and that in its decree the Court was exercising a rightful and provident jurisdiction.

In this State the Court of Chancery has always had the power to convert the real estate of an infant into money, and it exercises this power for the infant's benefit. The infant's property is not taken from him; the change in the character of the property is made only when it will promote his benefit to make it. *Dorsey vs. Gilbert,* 11 *Gill and Johnson,* 87. The Act of 1785, chapter 72, section 12, provided for the exercise of this power, in cases where the infant had an interest in common with any other person; and by that Act, whenever it was to the interest and advantage of the infant and the other owners of the property, the Court was required to order a sale. It will be seen that the right of the parties to have a sale, under the circumstances mentioned, was absolute and unqualified. A sale made with a reservation of a contingent interest would be effected under very disadvantageous circumstances; and in the present case would have operated with peculiar injustice against the widow, and the two children who had fee simples not subject to any future contingency. The shares of the property belonging to these parties were not liable to be diminished by the birth of children; and justice required that they should have their due proportion of such sum as an unincumbered title would bring. It is a practical denial of justice to them, if the sale cannot be made, disincumbered of future contingent claims on the property. Now it is argued that the interests of the contingent remaindermen could not be sold, because not being *in esse* they could not be made actual parties to the proceeding, and no one could represent them in the case. And in support of this position it is said that, no one is bound by a decree unless he is a party to the cause, either actual or by representation. The formal and technical terms in which a rule of law is enunciated, seldom give us much insight into its real mean-

ing. We must see how it is applied in practice if we would understand its scope and effect. Lord REDESDALE, in *Giffard vs. Hort,* 1 *Schoale & Lefroy,* 408, shows the application of the rule to a case involving contingent remainders to persons not *in esse.* "Courts of equity have determined, on grounds of high expediency, that it is sufficient to bring before the Court the first tenant in tail in being, and if there be no tenant in tail in being, the first person entitled to the inheritance, and if no such person, then the tenant for life, and as Courts of equity constantly act on these parties being before the Court, in anything relating to the whole estate;" * * * * * * "Where all the parties are brought before the Court that can be brought before it, and the Court acts on the property according to the rights that appear, without fraud, its decisions must of necessity be final and conclusive. It has been repeatedly determined that if there be tenant for life, remainder to his first son in tail, remainder over, and he is brought before the Court before he has issue, the contingent remaindermen are barred; this is now considered the settled rule of Courts of equity and of necessity." And he is also cited in *Calvert on Parties,* page 31, as saying: " Contingent limitations, and executory devises to persons *not in being,* may in like manner be bound by a decree against a person claiming a vested estate of inheritance; but a person in being claiming under a limitation, by way of executory devise, not subject to any preceding estate of inheritance by which it may be defeated, must be made a party to a bill affecting his rights." In *Lloyd vs. Johnes,* 9 *Vesey,* 55, 56, Lord ELDON said: " A Court of equity in many cases considers the tenant in tail as having the whole estate vested in him, at least for the purposes of suit; and for those purposes does not look beyond the estate tail in a suit aiming by the decree to bind the right to the land. I distinguish between cases, where the suit is founded upon contract by the tenant in tail, and a suit to bind the land

in respect of charges created by the author of the gift, and imposing them therefore upon all, who take *per formam doni.* In the latter the subsequent remainderman has a clear interest in the event of the suit of the prior tenant in tail. If the event is adverse, in many cases he may be bound; if prosperous, in many he may gain. If an estate is sold under the judgment of the Court, for the very purpose of enabling this Court to carry on such suit, and the convenience of justice for the purposes of the suit, the remainderman would be bound, or have the advantage." His Lordship is not by any means to be understood as meaning that the only case, in which a subsequent remainderman is bound, is where a charge is imposed upon the estate by the author of the gift. This instance is put only as an example of the application of the rule, and in contradistinction to a contract made by the tenant in tail, which would not bind the remaindermen. The same learned Chancellor in *Cockburn vs. Thompson*, 16 *Vesey,* 325, said: "The strict rule is, that all persons, materially interested in the subject of the suit, however numerous, ought to be parties: that there may be a complete decree between all parties, having material interests; but that, being a general rule, established for the convenient administration of justice, must not be adhered to, in cases, to which, consistently with practical convenience, it is incapable of application. Accordingly there are several well-known cases of exception; and, without going through them all, I will mention one instance of not applying it to persons, having valuable interests in real estate: viz., where it has been held sufficient to bring before the Court the first person, having an estate of inheritance, though it cannot be denied, that, persons, having present, immediate, valuable interests in the same real estate, may become most deeply affected by what is done here in their bsence."

The result of Lord REDESDALE'S decision, above quoted, was that the subsequent remainderman was entitled to

appeal from a decree against the tenant in tail, because that decree barred him; and the House of Lords showed their approval of his decision, by passing an order allowing the appeal, in accordance with the report of a committee, of which the Lord Chancellor of England was chairman, and the Lord Chancellor of Ireland a member. 1 *Schoale and Lefroy*, 411. The opinion is regarded as an authoritative exposition of the practice in equity by Judge Story, in his work on *Equity Pleading, sections* 144 and 145; and by other learned text-writers, and has been quoted and adopted a great number of times by the Courts in England and this country. The rules of equity practice are not rigid procrustean formularies, which must be applied under all circumstances, without regard to the injustice and inconvenience which may be produced. The great Jurists, who established our equity system, founded it on the principles of enlightened justice as applied to the necessities of mankind. For the attainment of their beneficent purposes, they modified the results of the inexorable logic of the common law, and instituted salutary principles, which by their flexibility might be adapted to all the varying exigencies of social life. Their rules were framed with the special intent of attaining their great objects, and they did not commit the mistake of sacrificing the end to the means. One of the greatest authorities in equity has spoken with great clearness on this point. Speaking of another rule on the subject of the necessary parties to suits, he says: "It has been well observed, that the general rule, being established for the convenient administration of justice, ought not to be adhered to in cases in which, consistently with practical convenience, it is incapable of application, for then it would destroy the very purpose for which it was established." *Story's Equity Pleadings, section* 96.

Now when the petition for the sale of this property was filed in 1833, Baltimore County Court had the opportunity

to choose between two courses of action. It could authorize a sale of every interest in the property, and preserve the portions of the purchase money, to which persons not then in existence might in future contingencies be entitled; or it might refuse altogether to act, and leave the property to go to destruction. It adopted the former alternative. The property was sold for its full value, and the contingent interests in the purchase money were carefully and faithfully preserved. It cannot be questioned that the action of the Court was the wisest which could have been taken for the benefit of all concerned. Every living person was before the Court who could possibly have the least interest in the property, and their interests were identical with those who were unborn. To have required more would have been to demand impossibilities. If a Court of equity cannot deal with property under such circumstances, and exercise its powers for its benefit, then such property is beyond the pale of the law. It is outlawed. I cannot bring my mind to such a conclusion. In the very able and well reasoned opinion delivered by the Chief Justice, reference is made to the case of *Goodess vs. Williams,* 2 *Y. & Coll., N. R.,* 595, in which it is decided that " Where a person is seised in fee of an estate, having that seisin liable to be defeated by a shifting use, conditional limitation, or executory devise, the inheritance is not represented in equity merely by the person who has the fee liable to be defeated." But it must be considered that in the case cited the executory devisees whose estate might defeat the estate in fee, which was represented in Court were then *living persons;* and it was for this reason that they were required to be made parties. According to the opinion of Lord REDESDALE, already quoted, if they had not been in being, their interests would have been bound by the decree against the persons holding the defeasible fee. And to the same effect is Judge STORY's opinion, *Story's Equity Pleadings, section* 145, where he states the

doctrine in almost the same words, referring to *Mitford's Equity Pleading*, and *Cooper's Equity Pleading*. But he takes particular pains to say in section 147, that if the persons *are in esse*, who are entitled to the executory devise which may defeat the precedent estate in fee, they must be made parties. If these authorities are correct, they are conclusive of this case. They describe with perfect accuracy the case now presented ; the contingent limitations to persons not in being, would, when they came into existence defeat the vested estate in fee, and the owners of this defeasible fee were in Court, when the decree of 1833 was passed. The very question in this case was decided by the Court of Appeals of Virginia in *Faulkner vs. Davis,* 18 *Grattan,* 651, in an opinion of very great ability and learning. It was held where property owned in part by infants had been sold under a decree where all living persons interested in the property were made parties, that the contingent interests of persons not *in esse* were bound by the decree. The Court distinctly decides that although unborn grandchildren were, of course, not *personally* parties to the suit, because it was impossible to make them such parties, yet they were parties to the suit by *representation,* and were as effectually bound by the decrees made therein, as if they had been in being and made personally parties to the suit. And the principle is recognized as the law of Virginia by the Supreme Court of the United States in *Knotts, et al. vs. Stearns, et al.,* 91 *U. S.,* 638.

But it has been argued that the Act of 1862, chapter 156, and the Act of 1868, chapter 273, show that in the opinion of the Legislature, previously to those Acts, a Court of equity had no power to bind by a decree of sale the contingent rights of persons not *in esse.* Let us examine these Acts. Previously to the Act of 1862, a Court of equity had no power, except in cases where it was necessary for the purpose of partition, to sell legal estates, on

the ground that it was advantageous to the owners to have a sale, in any case where an infant was not interested. The power of sale for this purpose was limited by the ninety-ninth section of the sixteenth Article of the Code to cases of joint tenancy, tenancy in common, coparcenary or other concurrent ownership. And notwithstanding the fifth section of the Act of 1831, chapter 311, (codified as Article 16, section 42, of the Code) it is more than doubtful whether there was any power to decree a lease of the property, unless an infant was interested in it. The Act of 1868 is merely a re-enactment of the Act of 1862 with some few additions. It provides: "In all cases when one or more persons is or are entitled to an estate for life, or years, or to an estate tail, fee simple, conditional, base or qualified fee, or any other particular, limited, or conditional estate in lands, and any person or persons is or are entitled to a remainder or remainders, vested, or contingent, or an executory devise or devises, or any other interest, vested or contingent in the same land; on application of any of the parties in interest, a Court of equity may, if all the parties in being are parties to the proceeding, decree a sale or lease thereof, if it shall appear to be advantageous to the parties concerned," and also, that the decree shall bind all persons whether in being or not. It will be seen that it authorizes either a lease, or sale of land, in a number of cases where the parties are neither joint tenants, tenants in common, parceners, or concurrent owners of any kind. Very important additions are made to the powers previously vested in Courts of equity, and these sufficiently account for the passage of the Act. No special reference, however, is made to the property of infants. The requirement that all parties in being should be brought before the Court, and the provision that the rights of persons not *in esse*, should be bound were most probably suggested by the familiar equity practice in similar cases. We need not be surprised that no cases of

this kind can be found in England ; because there chancery has no power to convert an infant's land into money for his benefit. But surely where this jurisdiction exists, as it does in Maryland, it ought to be exercised according to the same rules of practice which are applied to other suits in chancery. On this point we may profitably take heed to an admonition given by Lord Chancellor NOTTINGHAM: " It is the duty of every Court of equity to adapt its practice and course of proceeding, as far as possible, to the existing state of society, and to apply its jurisdiction to all new cases, which, from the progress daily making in the affairs of men, must continually arise ; and not, from too strict an adherence to forms and rules, established under very different circumstances, to decline to administer justice, and to enforce rights, for which there is no other remedy." It will be seen from what has been said, that I am unable to agree with the conclusions reached in *Downin vs. Sprecher.* But if this case is to be regarded as the settled doctrine of the Court, the decree of Baltimore County Court ought nevertheless to be sustained. The power of sale given to Henry Long as executor was certainly a trust, and he had deliberately renounced it. It is a rule without exception that equity will not allow a trust to fail for want of a trustee. *Story's Equity Jurisprudence, sections* 976 *and* 1059. It has not been doubted since the decision of Lord NORTHINGTON in *Hewett vs. Hewett,* 2 *Eden's Reports,* 332, that the Court will carry into effect a power of this kind for the benefit of those interested in it, when the person on whom it is conferred refuses to do so. *Faulkner vs. Davis,* 18 *Grattan,* 681. On this point we may also refer to *Story's Equity Jurisprudence, section* 1060.

The decision of the Court in this case will disturb a decree which has been regarded as a final adjudication for more than half a century. It will take from the appellees a large amount of property, which they have honestly

purchased and paid for, and will reverse a practice which
has existed in the City of Baltimore beyond the time of
living memory, and which in my opinion is founded on
established precedent, and the true theory of chancery.
It will introduce uncertainties and embarrassments in
titles to real estate, which no man can measure.  With
unfeigned diffidence, I dissent from the very able and
learned opinion of the Court ; but a sense of duty compels
me to say that, according to my deliberate conviction, the
decree of the Circuit Court ought to be affirmed.