Mr. Justice Ha&ner
delivered the opinion of the court.
This is an action of ejectment to recover an undivided moiety of two lots in square 160 in Washington city. The plaintiff claimed under the will of his father, Joseph Thaw, admitted to probate in 1840, which devised all his estate, including these lots, to his wife Eliza V. Thaw, for life, in trust, to apply the income of the property to the maintenance of herself and their two youngest children, Columbia Thaw, and Columbus Thaw, the plaintiff. In the event of the death of the children, their interests were to devolve upon the widow, and upon her death the whole estate was to belong to the children equally. The widow died in February, 1866. Columbia Thaw in May, 1848, executed a conveyance of her interest to Agricole Favier. At the trial in the circuit court the plaintiff offered in evidence the will, and proved the foregoing facts and there rested.
The defendant claimed title through mesne conveyances from Favier. He had purchased the lots from Mrs. Thaw, who claimed the right to sell, under a decree of the Or *359 phans’ Court of the District of Columbia, of 29th March, 1844, which was “affirmed” by the circuit court, 12th October, 1844. Favier received from her a conveyance dated llth March, 1848, which was not recorded until March 1, 1861.
To sustain this defence the defendant offered in evidence Guardian’s Docket No. 2, Case No. 646, in the office of the Register of Wills, containing the following entries, viz.:

And the following entries contained in a book in the office of the Register of Wills, called a “ scrap-book,” and marked E. N. R., No. 2 — Proceedings 1846 to 1861, viz.:
“Friday, January 21, 1848, sale of real estate Jos. Thaw, dec’ed, filed, ‘Order of appproval for,’ or ‘Order of approval filed;”’ and also read the two bonds referred to in the entries ; which were the only papers in that court connected with the guardianship or property. She also offered to read from Chancery Rules No. 4, Case No. 344, of the late Circuit Court of said District, the following entries, viz.:

She also offered to read the only paper remaining in the Circuit Court referring to this case, which was a copy of the petition of Eliza Y. Thaw to the Orphans’ Court, asking for authority to sell these lots, and of the order of that court of the same date authorizing the sale, certified by the then Register of Wills.
To all this testimony the plaintiff objected, and it was admitted provisionally. The defendant then offered testi *360 mony to show the disorderly condition of the records of the old Circuit Court, and of the Orphans’ Court, before 1863; That Favier and those claiming under him had been in possession of these lots from about 1846, and had paid the taxes upon the property; and also offered evidence of the conveyances from Favier and through his grantees to the defendant. She then proposed to show what had been the practice in the Orphans’ Court and Circuit Court for many years, by proóf of the passing by those courts in numerous cases of similar decrees of sale of the real estate of infants; and thereupon the presiding justice overruled the objection to the evidence first offered as aforesaid and admitted the same with all the other proof. From this ruling, as to the admissibility of testimony, and to other rulings upon the prayers upon both sides, the plaintiff excepted; and the verdict being, for the defendant, upon the instruction of the court, the present appeal was taken.
The case was argued at the close of the last session of the G-eneral Term, and the decision was reserved until the present time for fuller consideration, which it has received at our hands.
The admissibility of the evidence depends upon the question whether the Orphans’ Court of the District of Columbia possessed jurisdiction to pass the decree under consideration. If it had the authority to decree the sale' under the circumstances, we thinjk the several items of testimony offered, disclosing different steps in the course of its proceedings, were admissible, notwithstanding the grave omissions and inaccuracies they disclose upon the authority of Grignon’s Lessee vs. Astor, 2 How., 319.
The question of jurisdiction is therefore of controlling importance in the case.
It is insisted by the defendant that the authority was conferred by the terms of sec. 10, sub-ch. 12, of the testamentary law of Maryland, 1798, ch. 101, which is in force Vithin the District of Columbia.
It will be proper to consider first, the state of the law in Maryland with respect to the powers of guardians and of *361 the Orphans’ Court over the real estate of infants before the passage of that act.
It cannot be contended that any power to sell the lands of the ward belonged to the guardian virtute officis. Without the special authorization of a competent court any such attempt would have been justly punishable as an abuse of his office, and for any unauthorized diminution of his ward’s realty he would be chargeable in exemplary damages.
The early legislation of Maryland constantly recognized this want of authority in the guardian to sell or diminish the real estate of the ward. At an early day it was provided that there should annually be called by the county court an “ Orphans’ Jury,” to inquire “if any waste had been made of orphans’ lands.” 1715, ch. 19, sec. 33. It was further provided that the ward, ou attaining majority, should he entitled to enter into all lands which had come into the guardian’s possession by right of the ward, under penalty of treble damages for failure to yield possession. 1758, ch. 4.
The early statutes also required the maintenance of the ward from the income of his estate, alone, without any diminution of the principal.
By act 1715, ch 39, sec. 9, it was provided, that if the interest of his estate should be so small that it would not extend to a free education and maintenance of the orphan, he should be bound apprentice until twenty-one years, unless some kinsman or charitable person will maintain and educate him for the increase of his estate, “ without any diminution of the principal, which shall always he delivered to him at his full age.”
By the act of 1777, ch. 9, the office of Commissary General was abolished, and Orphans’ Courts were first established in Maryland ; hut no authority to consume any part of the principal of the ward’s estate was conferred until the' passage of the act of 1785, ch. 80, sec. 9, which authorized the Orphans’ Court to allow the guardian to apply a tenth part of the personal estate annually for his education.
In 1798, “The Testamentary Law,” as it is called, was *362 passed, which was designed as a compilation and amendment of the existing laws and regulations respecting wills, administrations and guardianships.
The courts establi shed by this act were to be composed of laymen. There was omitted even the provision of the act of 1777, which required that the judges should be selected from among the justices of the peace ; the only qualification was that they should be “men of-integrity and judgment.” The new tribunals were to be, as they were sometimes called, the people’s courts; and the cases where an educated lawyer ever occupied one of these offices, since the passage of that law may probably be reckoned on the fingers of one hand. Dr. Causin, the Orphans’ Court judge who passed the decree under examination, was, at the time, a practicing physician, but was doubtless as learned in the law as any who had ever held the position in this District up to the absorption of the court in the present judicial system of the District in 1863.
Naturally the legislature appreciated the necessity of restraining the .authority of courts thus constituted with a jurisdiction so obviously special and limited, within well defined bounds. In the words of the Court of Appeals of Maryland in Scott vs. Burch, 6 Harr. & J., 79: “To avoid the recurrence to incidental or implied authority, the powers of the Orphans’ Court, both in relation to the subject matter of its jurisdiction and the forms of its proceeding, are declared with the most formal and precise minuteness.”
But with the plain design of enforcing this purpose, so as to avoid all risk of its violation, there was added section 20 to sub-chapter 15, which declares that “the said Orphans’ Court shall not, under pretext of incidental power or constructive authority, exercise any jurisdiction whatever, not expressly given by this act or some other law.” With the same purpose it was declared by section 16, of sub-chapter 12, that “nothing in this act contained shall be construed to affect the general superintending power exercised by the court of chancery with respect to trusts.”
.The controlling authority of these provisions has never *363 been disputed; but it may be well to refer to a few of the multitude of instances in Maryland, in which they have been enforced by the appellate courts.,
■ Thus in 6 Harr. & J., above mentioned, in denying the authority of the Orphans’ Court to revoke one of its previ-’ ous orders, the court says: “Upon an examination of its provisions, the act of 1798, no such power can he found, and the exercise of such a power of revocation can only be countenanced'by the doctrine of constructive authority; hut recourse to such a principle is emphatically condemned by the express enactment of the statute.”
So in Spencer vs. Ragan, 9 Gill, 482, the authority of the Orphans’ Court to require executors to strike from the inventory property belonging to a petitioner was denied, because the statute had only'expressly authorized this to be done upon the application of the executor or administrator.
In the same volume, p. 91, Townshend vs. Brooke, upon the ground that “they are tribunals confessedly special and limited in their jurisdiction, without any-constructive or incidental power,” the Court of Appeals denied the power of the Orphans’ Court to order an administrator ad colligendum to pay counsel fees to fhe attorneys of the executors for resisting a caveat.
In Lowe vs. Lowe, 6 Md., 352, it was held on the same ground, that section 7 of sub-chapter 10, authorizing the Orphans’ Court to order an executor to pay over a part of a distributive share or money legacy before final account, where the applicant is needy and the personal estate plainly sufficient to pay the debts, does not embrace the case of a specific legatee; because the section speaks only of “a legacy of bequest in money.”
In Taylor vs. Bruscup, 27 Md., 225, an administrator applied to the Orphans’ Court for an order requiring the sister of the intestate to produce his bank book. The statute authorizes an administrator, who believes that any person has concealed any portion of a decedent’s estate to make such an application. The Court of Appeals held that as concealment was the ground of the jurisdiction, it should *364 be averred and established by the evidence; and that proof of mere withholding of property did not present the case contemplated; and hence that the Orphans’ Court erred in passing such an order. The opinion quotes as applicable the language of Lord Coke from 2 Inst., 543: “These particular jurisdictions, derogating from the general jurisdiction of the courts of common law, are ever strictly restrained, and cannot be extended further than the express letter of their privileges will most explicitly warrant.” See Conner vs. Ogle, 4 Md. Ch. D., 452; Norment vs. Brydon, 44 Md., 112.
In Brodess vs. Thompson, 2 Harr. & G., 125, the plaintiff sued to recover the cost of buildings erected on the ward’s land during his minority. The Orphans’ Court had expressly ordered their construction, and prescribed their size and materials; and the excellence of the work and reasonableness of the charge having been certified to by sworn viewers, the guardian’s account containing this charge was approved by the court, though in excess of the income of the estate.
The appellate court held that the power to exceed the income of the ward’s estate was to be exercised only for his maintenance and education; and that the Orphans’ Court had no authority to sanction the application of any part of the principal to the erection of new buildings.
Similar rulings have been made in this jurisdiction. Thus in Mauro vs. Ritchie, 3 Cranch (C. C.), 154, the court, after declaring tljat the Orphans’ Court has no power to remove a guardian for any cause not pointed out in the statute, continued: “If it claim jurisdiction to remove a guardian for any other cause, it must claim it as a jurisdiction incidental to the power of. appointment. But all incidental jurisdiction is expressly forbidden by the statute.” The Supreme Court in Yeaton vs. Lynn, 5 Pet. (30 U. S.), 230, questions the propriety of an act of the Orphans’ Court in revoking the letters of an administrator, upon his failure to give counter security, because the power was not expressly conferred by the statute and all exercise of implied powers is forbidden.
*365 Many other cases might be cited to the same effect; evincing as uniform a concensus of -opinion upon this point as upon any other in the law.
We have no alternative but to respect this unbroken current of decisions; and we therefore hold, as the unquestionable rule of construction, that the power to order the sale of an infant’s lands cannot be held to have been committed to the Orphans’ Courts bjr the statute, unless it has been expressly given; and that no considerations of convenience to suitors or of supposed legislative intention, however strongly implied, will avail if it has not been so expressed. That court could no more justly claim such authority, in the absence of an express grant, than it could grant a divorce, or admit to probate a will not executed as required by law; or accept an administration bond, without security, because such was the wish of the deceased; or grant administration when the deceased was domiciled, or the bona notabilia sought to be administered were outside the boundary of the district, however near the dividing line. The unanswerable response to such applications would be: “The said Orphans’ Court shall not, under pretext of incidental power or constructive authority, exercise any jurisdiction whatever not expressly given by this act or some other law.”
It is in the light of these principles that we are to examine the provisions of the act of 1798, ch. 101. The statute is a very long one, containing five sections, the third of which, for convenience, is subdivided into fifteen sub-chapters. The provisions referring especially to “Guardians and Orphans,” are contained in sub-chapter 12, and the 10th section, under which the power to uass such a decree by the Orphans’ Court is claimed, reads as follows:
“And once in each year or oftener, if required, a guardian shall settle an account of his trust with the Orphans’ Court; and the said court shall ascertain at discretion the amount of the sum to be annually expended in the maintenance and education of the orphan, regard being had to the future situation, prospects and destination of the ward; and the said court, if it shall deem it advantageous to the *366 ward, may allow the guardian to exceed the' income of the estate, and to make nse of his principal and to sell part of the same under its order; provided, nevertheless, that no part of the real estate shall, on account of such maintenance and education, be diminished without the approbation of the court of chancery or general court as well as of the Orphans’ Court.”
That part of the section which declares that “the said court, if it shall deem it advantageous to the ward, may allow the guardian to exceed the income of the estate and to make use of his principal and to sell part of the same under its order,” cannot be invoked as affording anything like an express power to decree a sale of an infant’s lands. The provision plainly, by its terms, its context and the history of its origin and expansion, refers only to the personalty of the ward. And such has been its uniform construction by the courts of Maryland. Thus in Brodess vs. Thompson, 2 Harr. & G., 126, the court says:
“ The interest or income of a minor’s estate is the fund out of which he is to be maintained and educated, and under no circumstances could be exceeded until the act of 1785, ch. 80, was passed. By the ninth section of that law, the Orphan’s Courts are invested with authority to allow the guardian to apply a part of the personal estate, not exceeding a tenth part thereof, to the education of his ward. The act of 1798, ch. 101, in its tenth section of the twelfth sub-chapter,'only enlarged this authority, by extending the expenditure to any part or the whole of the personal estate if necessary.”
The twelfth section of the same sub-chapter is introduced, to prescribe the mode in which the guardian should carry into effect the power of sale where the personal property of a ward consists of specifics. The court must pass an order for such sale, specifying whether it is to be made for cash or on credit, and requiring the purchaser to give security, etc., and all the provisions in the statute relative to sales by executors, are expressly made applicable to such sales of personalty by guardians.
*367 It thus appears that where the statute designed to allow a diminution of the personal estate of the ward, it not only expressly conferred the jurisdiction upon the Orphans’ Court to allow such diminution, but in express terms it authorized the court to allow the personalty to be sold for the purpose.
We would not expect to find in the statute a less explicit grant of authority to sell and diminish the real estate of a minor, if such a jurisdiction was intended to be conferred upon the Orphans’ Court. Indeed, one would naturally look for greater explicitness in a grant of such an authority, when we recall the astonishing importance attached to the possession of land at that day and the exacting formalities then attending its transfer or incumbrance.
But the only expression in the law which is relied upon as creating such an authority in that court, is comprehended in these words in the tenth section, “Provided, nevertheless, that no part of the real estate shall, on account of such maintenance or education, be diminished’without the approbation of the court of chancery or general courts, as well as of the Orphans’ Court.”
The remaining sections of the sub-chapter which have reference to the ward’s lands, are framed with a cautious view to the strict accountability of the guardian, and differ but little from the previous stringent laws on the subject. The guardian is to have the realty reported on by viewers appointed by the court; he is strictly forbidden to commit waste on the land; but the court on application. may authorize him to cut down and sell wood for the ward’s maintenance and education; and stringent rules for the leasing or cultivation of the lands in one of the several modes specified in the law, are explicitly laid down for the guidance of the court and guardian.
And yet there is not a word throughout this comprehensive statute, the provisions of which frequently descend to details well nigh trivial in their minuteness, that gives the sligliest direction or hint as to the mode in which the realty is to be sold; the machinery by which it is to *368 be effected, or tbe terms upon which the infant is to be deprived of what at that day was an important qualification to vote, .and the indispensable qualification to hold high public office. The legislature that so cautiously guarded against the unauthorized diminution of the timber on the land, or its careless cultivation, could scarcely have designed that the houses and-lands together might be struck off with fewer accompanying safeguards than surrounded the order to cut firewood on a corner of the farm.
Again, to have conferred such a jurisdiction upon the Orphans’ Court would have been altogether unnecessary. There existed at the time, as there had done in Maryland from the earliest period, a tribunal of general jurisdiction, fully authorized to decree the sale of the real estate of minors.
In Dorsey vs. Gilbert, 11 Gill & J., 90, the court says : “ It was an undoubted power of the court of chancery, before any of our legislative acts authorizing the sale of infants’ estates, to convert the real estate of an infant into money; and many cases may be found where the guardians of infants tinder particular circumstances have been authorized to make this conversion. The court of chancery, in the exercise of this jurisdiction, acted under a delegated authority from the king, who, as parens patrice, had jurisdiction over the persons and estates of infants. The legislation of this State, in relation to the sale of infants’ estates, is but a modification and enlargement of an acknowledged power. The property of the infant is not in any manner impaired or lessened, but a change in its character alone is effected, and that for his benefit.”
And this principle, admitted throughout the decisions of the courts of that State, is reaffirmed in one of the last volumes of its reports, Long vs. Long, 62 Md., 80, in these identical terms.
Hence, in 1*198, the guardian had the clear right to institute appropriate proceedings in a chancery court for the sale of his ward’s real estate; and out of the proceeds, when realized, the court had full authority to allow the *369 expenditure of part of the fund for his maintenance and education. But as the exercise of this authority of diminishing the fund in the chancery court might conflict with the pending administration o'f the ward's estate, thereafter to be more fully vested in -the Orphans’ Courts, the wise provision for insuring fidelity of accounting and preventing waste, was introduced into section 10; which, as we understand it, was designed to forbid the diminution pf the proceeds of the land, after it had been sold in chancery or possibly by a guardian under a will, without the approbation, as well of the chancellor who might have decreed the sale, as of the Orphans’ Court which already had the guardian’s, accounts before it and could better judge whether a necessity existed for diminishing the proceeds of the realty. The new restriction therefore might rather be considered as a limitation upon the pre-existing power of the chancery court, which was no longer to be at liberty, of its own discretion alone, to diminish the realty of the ward; and the purpose of the proviso would have been more plainly disclosed by changing the frame of the sentence so as to read that the chancery court should not thereafter diminish the real estate of the ward without the approbation of the Orphans’ Court.
That the words relied on fall far short of an express grant of jurisdiction to order a sale of the real estate of a minor seems self-evident. That there is an absence of any necessary implication of such an authority even, seems also plain ; and its possession by the Orphans’ Court can only be sustained by the most liberal invocation of that “ incidental power or constructive authority,” which is so positively forbidden by this statute.
It is a circumstance entitled to great consideration, that during all the interval since the passage of the act of 1798, no reported case can be found in Maryland where the Orphans’ Court has assumed to exercise such a power of sale. The only instance that has ever been relied on to the contrary is that known as Goltier’s Case reported in a note to Williams’ Case in 3 Bland, 200. But examination will ‘ *370 show that the relief sought there'was not that referred to in sec. 10 of sub-chapter 12. It was not an application to diminish the realty at all, nor was it sought to sell the real estate of infants “for their maintenance and education,” which is the only ground of whatever jurisdiction is recognized in that section. The guardian there did not ask that any part of the principal should be so applied, but he stated that the owners of eight undivided ninths had contracted to sell a mill and adjoining lands, provided the petitioner should be able to convey the remaining one-ninth interest of his children therein, for a price which he deemed advantageous ; and he asked that he might be ordered to convey his children’s interest to the purchaser. It was a prayer, in effect, for such a decree as the chancellor was authorized to make under sec. 12 of the act of 1785, ch. 72. The Orphans’ Court declared its opinion that*the sale was for the advantage of the children and should be confirmed, and authorized the petitioner to execute the deed. The case was then laid before the chancellor, who did not profess to act under section 10 of sub-chapter 12 ; but under section 7 of that sub-chapter (the report of the case in that particular in Bland being incorrect, as appears from an authenticated copy of the proceedings which I have placed among the papers in the case). The precise text of the order is in these words: “Under power vested in this court by the act of 1798, ch. 101, sub-ch. 12, sec. 7, the above order of the Orphan’s Court is approved.”
This order seems as indefensible under the one section as the other, for the case is certainly an extraordinary one, even when it is viewed, as it should be, as a mere application to ratify a sale already contracted to be made; to change an investment, while preserving the corpus undiminished.
The most careful search among the records, and painstaking inquiry of the most learned and experienced of the distinguished judges and lawyers of Maryland have resulted in the conviction that no case has been heard of, .where such a proceeding as the present was ever undertaken in that State. That Orphans’ Courts possessed no power to order *371 a sale of lands and had no jurisdiction over real estate, was there regarded as an axiom, until the passage of the act of 1865, ch. 162, sec. 3, which for the first time intrusted to them concurrent jurisdiction with chancery to order the sale of the real estate of intestates, of limited value, upon appropriate proceedings specified in the act. Previously, the uniform language of the courts had been to the effect that “controversies with regard to real estate must be settled in another forum;” and that “the several acts of assembly, from which the Orphans’ Courts derive their powers, restrict the action of those courts in cases of intestacy entirely to personal assets. None of them confer any jurisdiction over the realty.” Hayden vs. Burch, 9 Gill, 82. .
Upon this ground, and because the exercise of a power of sale of realty by an executor under express directions in a will, was outside of the duties which were intended to be regulated by the act of 1798, it was uniformly held by the courts that the money coming into the hands of the executor from such a sale of realty, was not covered by the testamentary bond, until it was expressly provided otherwise by the act of 1831, ch. 315. That the ordinary guardian’s hond would not be answerable for the proceeds of land coming into the guardian’s hand would appear to be equally clear; and it would seem to have been conceded in the present case, by the requisition by the Orphans’ Court of a different and additional bond by Mrs. Thaw before she should make the sale, in which she is described as trustee under the decree, and is bound to the discharge of her duties in that capacity.
Although the entire proceedings, from the petition onward, assume and rely upon the Orphans’ Court as the soirrce of authority to Mrs. Thaw to dispose of the land, it has yet been ingeniously argued that, conceding there may have been some want of explicitness in the grant of power to the Orphans’ Court to sell the real estate, still the present proceeding may be regarded as having received its effective strength from the act of the circuit court; that the power to sell was therefore communicated by the order of a court *372 possessed of ample jurisdiction to order a sale of an infant’s realty; that the force of such decree could not be impaired by its approval by the Orphans’ Court; and that it is quite unimportant whether the approbation of the Orphans’ Court preceded or followed the action of the circuit court.
But if we were dealing with a proceeding which derived its original strength from the action of the circuit court as a court of chancery, its decree, in the absence of some statutory dispensation, could be valid only where there had been an observance in the progress, of the controversy of those prerequisite conditions which are indispensable to the proper administration of justice.
Of these prerequisites, the most fundamental and familiar is, that no one should be condemned without a hearing; and this impregnable axiom should especially be maintained where a court of equity is passing upon the rights of infants, the most helpless class of its suitors.
The case of Hunter vs. Hatton, 4 Gill, 124, shows that a decree had been passed by a court of general equity jurisdiction to sell the real estate of a minor upon the petition of her guardian and next friend, alleging that a sale would be for her interest and advantage. The infant was not made a party to the suit. The act of 1816, ch. 154, prescribed the form of proceeding where the court was asked to decree on such an application. It contemplated that the infant should be made a party and that testimony should be taken in the usual mode. By the act of 1818 the court was directed, as a more satisfactory mode of proof, to issue a commission to freeholders to' report whether the sale would be for the interest of the infant; and as this last act made no mention of summoning the infants, it had been assumed, in the case cited, that it was no longer necessary.
But the Court of Appeals held that as the later act contained no express repeal of the requirement as to the summons under the previous law, the. decree to which she was not a party was invalid, and was not admissible in evidence against her in a suit brought by her to recover the land after she had attained age. The court says: “The objec *373 tion to the evidence offered on the ground that the infant was not summoned and made a party to the proceedings before the court, for the sale of her land, is not an objection to the jurisdiction of the court over the subject matter of the petition, but rests upon the broad principle, both of law and equity, that, unless in cases where it is otherwise provided by legislative enactments, decrees and judgments of courts of law and equity are only binding on the parties to the proceedings on which they are founded, and those claiming under them.” And after pointing out the necessity of the appointment of a guardian ad litem for the infant, and the duties which would have devolved upon him in the course of the controversy, the court continues: “To deprive them, the infants, of these privileges, would be entirely inconsistent with the whole policy of our legislation, which has ever evinced an anxious desire to throw around the rights of infants, to their real estates, every necessary and salutary safeguard.”
Again: by the act of 1785, ch. 82, thl court of chancery was authorized to decree the sale of the real estate of a decedent for the payment of his debts, where the personalty was insufficient.
•In 1826 the old circuit court of this District passed such a decree, upon a creditor’s bill brought against the administrator and the infant heirs. The land was sold, the sale ratified, and the purchaser received a deed, and was in possession in 1834, when the Supreme Court, on a bill of review brought in behalf of the heirs, declared the whole proceedings in the original suit invalid hnd annulled the decree and sale. The case, Bank U. S. vs. Ritchie, 8 Pet., 140, was decided upon grounds which the losing party doubtless considered extremely technical. In the opinion, Chief Justice Marshall first called attention to the fact, that although the court had appointed a guardian ad litem to answer for the infants, yet the person so appointed did not appear from the record to be a relative of the infants though their parents were living. “He was appointed,” says the court, “on the motion of the counsel of the plain *374 tiff, without bringing the minors into court or issuing a commission for the purpose of making an appointment. This is contrary to the most approved usages and is certainly a mark of inexcusable inattention.” “ The infants’ answer, though signed by the guardian, was not sworn to; and although the insufficiency of the personal estate is admitted by the administrator, it was not otherwise established by the proof, nor were the claims of the creditor established except by the admissions of the guardian.” The court declared these omissions to be fatal defects in the proceedings, and says: “Independent of these special requisitions of the act it would be obviously the duty of the court, particularly in the case of infants, to be satisfied on these points.”
And in 1844, the Supreme Court, in Shriver’s Lessee vs. Lynn, 2 How. 43, in setting aside a trustee’s sale ratified by the chancery court of Maryland in 1813, because the land sold had not been embraced in the decree to sell certain other enumerated lands of the same owner, uses this apt language: “No court, however great may be its dignity, can derogate to itself the power of disposing of real estate without the forms of law. It must obtain jurisdiction of the thing in a legal mode. A decree without notice would be treated as a nullity. And so must a sale be treated which has been made without an order or decree of the court, though it may have ratified the sale.” “The sale being without authority, the ratification of it by the court must be considered as having been given inadvertently. If given deliberately and on a full examination of all the facts, still it must be regarded as an unauthorized proceeding.” *
Courts of justice are not at liberty to content themselves with the bare recognition of these principles and their mere repetition as amiable, legal platitudes; they have no alternative but to apply them effectively, where the facts justify their application.
Examining the proceeding before us, as though it had originated or were principally conducted and had received *375 its effective strength from the circuit court decree, we are to inquire whether there appears in the statute any dispensation of the usual and essential requirements to a valid decree in chancery cases. The answer must be in the negative, for there is not the slighest hint of any intention to interfere with the chancery procedure, as it should have been maintained in common justice and reason, and as it did in fact exist before the act of 1798.
And viewing this as a chancery proceeding, to be conducted according to recognized ehancery methods, it is obvious there was a total disregard throughout, of all those safeguards, which in the cases cited were declared to be of such vital importance that their omission invalidated the decrees passed in their absence.
This petition was filed by Eliza Y. Thaw, who, though spoken of in it as executrix, is not named therein as guardian. We have seen from the cases cited, 4 Grill and 8 Peters, that if she had filed it as guardian and next friend, it would still have been necessary that the infants should be made parties and summoned, and should answer under the oath of their guardian ad litem and that the case should be fully proved against them on an examination where they could be represented. But in the case before us there was no attempt to comply with either of these indispensable requirements. No notice whatever was given to the infants or to any friend in their behalf, from the beginning to the end of the proceeding; neither of them appeared in person or otherwise, and there is nothing in the case to show that the plaintiff was ever apprised of the proceedings until after he attained his majority.
The only intimation of anything like evidence having been adduced in the case is the statement in the copy of the decree of the Orphans’ Court produced from the circuit court, that “on the petition, exhibits, accompanying proofs and representations of the said Eliza V. Thaw in her capacity as guardian and executrix,” the sale was ordered. If any “proofs” did accompany the petition, beyond the exhibits and “the representations of the petitioner,” there is nothing *376 to show that they were ever filed in the Orphans’ Court, or transmitted to the circuit court, for nothing whatever was sent to the latter, except the copy of the petition and decree; and this copy is the sole evidence of their contents, and even that such a petition was filed or such a decree passed. That a chancery court could have regarded such a presentation of an application to sell an infant’s land as sufficient in essentials of form or as supported by proper proofs to justify a decree, is inconceivable.
Again, the only possible ground upon which the sale could have been claimed under section 10, was that the income of the infant’s estate was insufficient for his maintenance and education, and, hence, that it was necessary for those purposes that the principal should be sold and diminished. But the petition was not framed upon that theory and presented no such state of case; not a word appears there nór anywhere among the records of that court to show what the orphan’s estate or income amounted to, or whether it was insufficient for the purposes indicated. Mrs. Thaw was tenant for life of the entire estate, the income of which she was authorized to apply for the maintenance of herself and the two children. Four years after the death of her husband she filed this petition, alleging that “The property of the deceased is insufficient to support her and the children provided for in the will,” and praying that “The court will deem it expedient and cause the said lots to be sold for the purpose of relieving the immediate wants of the petitioner and for the support and education of the children.” The decree, passed on the same day by the Orphans’ Court, declared that “The guardian, for her minor children and herself, is authorized and empowered to sell,” etc. These proceedings do not bring the case within the design of the provision of section 10. The principal object of the application was the suj)port of the petitioner and to relieve her immediate wants; the needs of the children are certainly not the main purpose of the application, but they appear to be mentioned incidentallv, rather than relied on as its object. Indeed the sale of the interest in remainder *377 of the children, in view of the age of the widow, who lived twenty-two years afterwards, could have contributed but to an insignificant extent towards their then maintenance or education. What the lands brought at the sale nowheré satisfactorily appears; and in the deed from Mrs. Thaw to Favier, dated March, 1848, and first placed upon the records in March, 1867, the consideration is stated as “the sum of -lawful money,” etc. Nor is there a particle of proof throughout the case that the infants ever received any benefit,'in any form, from what may have been realized by the sale.
The proceeding throughout appears simply as an application by a tenant for life to realize in money the value of her life interest in lands, and perhaps incidentally to place in some more profitable form of investment whatever might remain after the application of part of the proceeds to pay her own debts.
But the will, on its face, presented an insuperable difficulty that should have prevented a court of chancery from recognizing any authority in the Orphans’ Court to interfere in the matter. The property is expressly left to the widow to hold during her life, “in trust for the equal benefit and maintenance of herself and of the two children,” with remainders and upon conditions expressed with considerable pains, though with some confusion of language. With the administration of such a trust the act of 1798 expressly forbade the Orphans’ Court to interfere. That an Orphans’ Court should undertake to appoint a trustee, was a novel proceeding. The chancery court remained the sole tribunal where jurisdiction over property so circumstanced was to be exercised; and that court should not have undertaken the administration of the trust, upon a case so defectively presented and in absence of proof.
It seems clear to us then, that if the process had been inverted, and this application had been made to the circuit court in the first instance, that court could not properly have granted the relief prayed, in view of the manifold errors and imperfections of the proceeding. And since the Or *378 phans’ Court was without jurisdiction to decree, proprio vigore, we cannot believe that the united illegal acts of the two tribunals, each without competent authority, could together confer a lawful power of sale.
Nevertheless, the Orphans' Court did pass a decree and the circuit court did “affirm'' that decree, according to the few words in the minutes, which authorized and empowered the life tenant, assuming to act as trustee, to sell the lands devised in remainder to the infant children “at public or private sale,” “upon such notice by advertisement as she shall deem reasonable,” for cash or on credit, at her option; and to execute to the purchaser “ a valid deed of conveyance in fee simple of the premises, with all the right and estate therein of the said Columbia and Columbus Thaw, minor children aforesaid.”
From this ex parte decree no appeal could have been taken. The only party to the proceeding, the life tenant, was content. She had selected the land she wished to sell; she desired prompt action from the court and she obtained it, for the decree seems to have followed-instantly. The brief interval allowed bjr law for an appeal from an order of that court, in the nature of things, would long have passed before the minors would attain age or be competent to demand it; And if the decree was really passed upon testimony of witnesess,” then no appeal could be allowed unless the party should immediately notify his intention to appeal and require the testimony to be reduced to writing and sent to the appellate court within thirty days. Sub-ch. 15, sec. 18. A case resembling this in some of its features is Holbrook vs. Brooks, reported in 33 Conn., 349. Under the express authority of a statute the probate court ordered the sale by the guardian of an infant's land, in which, as in the case before us, the guardian had an undivided interest. His return to the court, very promptly made, set forth the particulars of the sale; and this was recorded by order of the court. The guardian then resigned and turned over to his successor in office the purchase money stated in the return ; but passed no account of the ward's estate in the court. *379 Suit was brought upon the guardian’s hond after the ward had reached the age of twenty-eight, in which it was claimed that the guardian's return had assigned' to the ward less than the full value of her undivided interest in the land* and had reserved for his own interest more than he was entitled to. The defendant relied upon the conclusiveness of the action of the probate court in ordering the recording of the return ; but the supreme court held that the order was merely ministerial, and was not an adjudication of the correctness of the report and that it could not be precluded from the pending inquiry by any action had by the probate court on that return. The opinion says: “A glance at the proceedings in this case will show the absurdity of the defendant’s claim. The guardian made a return that he had sold, the property — bona fide and for a fair price, if you please— for a certain sum, which return was recorded. Though required by law and entered of record, it was, nevertheless, but the naked declaration of the party in interest, not under oath and not subject to the usual tests of a cross-examination. The adverse party was not present and had no opportunity even to tell her own story; and the court, in no way or manner found the declaration to be true. To give -such a proceeding the force of a judgment conclusively binding upon tbe parties, would sanction a manifest fraud in the present case, and open a wider door to frkud in the future.”
x Even if the Orphans’ Court of the District of Columbia had been clothed by the statute with a special jurisdiction to decree such a sale, it would be essential that the jurisdictional facts should appear in the proceedings. 6 Wheat., 126. But the entire absence here of all proper action on the part of the guardian would render the proceedings obnoxious to the criticisms in the Connecticut case; for we find no entry on any record to show that the guardian ever passed any account with her wards, or that either court ever ratified the sale or had any information that it had been made, except the few words in the handwriting of the then Register of Wills, which one of his successors found among other loose slips of paper in an old portfolio in the office, *380 and pasted on'the brown paper leaves of a scrap boob, such as is used to preserve newspaper clippings.
If the plaintiff were in possession and the defendant had brought an ejectment, is it possible she could recover upon this evidence? We are of the opinion that the entire proceedings, from the filing of the petition, were grossly imperfect, irregular and unauthorized, and are ineffectual to divest the title of the plaintiff to the lands described in the declaration.
It has been urged by the plaintiff’s counsel that the proceedings were still further illegal, because the interest of the minors in the lands sold were estates in remainder or reversion, and not in possession. But as we are of opinion the Orphans’ Court was without authority to decree the sale of the real estate, in any event, it is needless to consider this point. Nor, for the same reason, can we hold that the act of Congress of 1848, March 3, operated as a repeal of a power of sale vested in the Orphans’ Court by the act of 1798. As no such power was conferred by that act there could be no repeal of what did not exist.
But the observations we have already made as to the needlessness of conferring the power to sell the realty of infants upon the Orphans’ Courts in 1798, in view of the plenary power then existing for that purpose in the courts of chancery, apply with double force to the present proceeding, commenced after the passage of the act of Congress of 1843, entitled “An act to provide in certain cases for the sale of the real estate of infants within the District of Columbia.’’
The legislature of Maryland from time to time had passed laws to regulate the exercise by the court of chancery of its admitted powers, with a view to the greater security of suitors, especially where infants were parties jointly interested in real estate. But no such regulations had been adopted in that State respecting the sale of real estate belonging to infants alone up to 1798; nor was there such legislation in Maryland until the law of 1816, the best features of which were incorporated by Congress in the act of 1843. This excellent statute from that time became leg *381 islative instruction for the chancellor as to what should be required as proper safeguards wherever an application should be brought before him for the sale of an infant’s real estate. It exacts a petition by the guardian, duly verified, stating all the facts, calculated to show whether the ward’s interest will be promoted by a sale. It provides for all proper parties; for answers under oath by proper guardians ad litem; for answers in addition by such of the infants as are over fourteen; for commissions to be attended by the guardians ad litem for taking the testimony of disinterested, witnesses; and for a decree only after it has been proved to the satisfaction of the court that the interest of the infant manifestly requires the sale of his real estate and that.the rights of others will not be violated thereby. It protects the infant against the practices of the guardian by providing that he shall not become the owmer of the land during the minority of the wrard; and it prescribes the manner in w’hich the proceeds shall be disposed of or invested; no diminution being allowable, of course, unless the Orphans’ Court shall also give its approbation. If it were unnecessary in 1198 to apply to the Orphans’ Court for an authority already possessed by the court of chancery, a/nd unreasonable to abandon its settled modes of procedure to improvise unguarded methods in an inferior court; a multo fortiori was it worse than unreasonable, after the act of 1843, for a guardian to turn his back upon the ample safeguards and facilities afforded by that statute for the conduct of such an application, and resort to a procedure accompanied by as slight precautions for the rights of infants as could well consist with any disposition to guard their interest. It may have been deemed highly important by the tenant for life that she should, in as cheap and speedy a manner as possible, be enabled to sell her life estate in the lots disembarrassed by the estate' in remainder of the infants; but it was a manifest wrong to these children to expose their interest in the father’s land to the certainty of sacrifice. Nobody could be in doubt as to which of the parties would be the loser by this mingling in one sale of these different rights.
*382 The defendant insists upon defences which, it is claimed, are available, notwithstanding there may have been a want of jurisdiction in the Orphans’ Court to pass the decree; and these remain to be considered.
The long interval since the sale, and the fact of ownership since that time by the purchaser and the subsequent grantees, is first relied on. But the possession by Favier and those claiming under him, with payment of taxes, etc., is not sufficient to defeat the plaintiff’s claim if it be otherwise well founded. Columbus Thaw had no right of entry upon the property until after the death of his mother, the life tenant, in February, 1866, much- less than twenty years before the impetration of the present action.
The supposed estoppel invoked against the plaintiff by the recitals in his deed to Little in 1811 cannot, in our opinion, be maintained. Neither the defendant nor her grantors were party to the deed. Such a recital can no more be invoked by a stranger against the plaintiff, than a recital to the contrary effect could be adduced by the plaintiff against the defendant. But the question is set at rest by the evidence set forth in the bill of exceptions, which is before us, free of objection. It shows, without contradiction, that the real estate referred to in the deed as having been disposed of by Mrs. Thaw and the proceeds invested in other real estate, was not the property involved in this suit, but was none other than the homestead on New York avenue.
Nor can we agree that the will of Joseph Thaw conferred upon his wife the power to sell and dispose of his real estate at her own pleasure. Neither the case of Second Reformed Presbyterian Church vs. Disbrow, 52 Pa. St., 219, referred to by the defendant, nor'the other cases examined by us where a similar ruling was had, would support the contention in the present case. Here there is no devise of the property to the wife out and out. It is expressly given to her “ To hold and enjoy during her natural life,” in trust for the equal maintenance of herself and her children; and it is only in the event of the death of both the children, that it is “then” *383 given to her and her heirs. The provision which devises and bequeaths to the children all the estate real and personal that shall remain at and after the death of their mother, can be fully gratified by confining its application to the portion of the remaining personalty that had not perished or been consumed in its use; and this is more consistent with the rules for the construction of wills than to consider the language as repealing the reiterated declaration of the testator, that his wife was only to enjoy a life estate.
Finally, we have been earnestly referred to repeated decrees of the Orphans’ Court, subsequently affirmed by the chancery court, ten of them between 1823 and 1844, and many others after that date, in which the existence of the jurisdiction to pass such decrees had been assumed; and we have been urged to respect this long-continued practice, and not to risk the disturbance of titles by a contrary construction.
We have beeii duly impressed by this consideration, and it has had great influence in our examination of the question of jurisdiction. The bare fact of the exercise of jurisdiction by a court has a certain weight, though no repetition of the claim to the authority can ever amount to proof that it is well founded. The judgment is still examinable by other tribunals, and if found to have been rendered without jurisdiction it will be treated as a mere nullity, as simply void, as a blank, as though it never had existed; ■for it is only the judgment of courts of competent jurisdiction that are held conclusive upon the parties or are entitled to respect as precedents. When the reviewing court ■has positively determined that the judgments in a certain direction are nullities for want of jurisdiction in the court •that rendered them, it is unimportant what may be their number, for no accumulation of usurpations and errors can • avail to establish jurisdiction in the entire series, if it does not exist with respect to each individual case. Even if we felt obliged by this judgment to overrule decisions made upon solemn argument and after mature deliberation (as *384 would be our duty if we were clearly convinced, after full examination, tliey were erroneous), we would be venturing upon no untrodden ground. When Chancellor Kent wrote, fifty years ago, he reckoned more than a thousand cases as overruled or doubted. The fourth edition of Greenleaf’s Overruled Cases, claimed to have added fifteen hundred cases to the great number contained in the first publication of the work; and the increase has been manifold since that time. The Supreme Court, in 12 Wallace, in overruling its previous decision in the Legal Tender Cases, said: “It is no unprecedented thing in courts of last resort, both in this country and in England, to overrule decisions previously made.” From 1821, the opinion in Anderson vs. Dunn, 6 Wheat., 204, was supposed to embody the correct law of that controversy; but in 1880 the same court, in Kilbourn vs. Thompson, 103 U. S., 168, denied its authority. There is probably no court that has not at some time overruled itself. In Blimline vs. Cohen, 8 Md., 147, the Court of Appeals determined that the court of common pleas of Baltimore city possessed no jurisdiction in cases of replevin, although it had previously taken cognizance of appeals from that court in such actions without questioning its authority. In Callender’s Adm’r vs. Ins. Co., 23 Pa. St., 474, the appellate court overruled the decision in Ewing vs. Furness, 13 Pa. St., 531, which had been given by the whole court, Gibson, Chief Justice, “on the authority,” as that ruling was expressed, “of several decisions of this court directly in point.” The opinion in the latter case concludes an interesting discussion of the doctrine of stare decisis; with these words of comment on the former decisions: “It is a plain error, and it is not our duty to set the stain that mischance has dropped upon the law.” And in a very recent case, the same court, in York’s Appeal, reversed its decisions rendered in 1857, upon a most important point respecting the application of the Statute of Limitations. As we have received no authenticated version of the opinion in the State reports, we cite, only as argumentative, the following extracts from their opinion refusing a rehearing of the case, *385 which are published as correct: “It is far better when this court commits a blunder to correct it in a manly way than to imitate the ostrich by hiding our heads in the sand. * * * That decision is but twenty-eight years old, and, as before stated, is not a rule of property. We now overrule it, and with it the other cases which have followed it. We restore the law as it stood before it was decided and reinstate the act of assembly.”
In none of the suits to which we have been referred, is it claimed there was any decision or even discussion of this question of jurisdiction, or even an appearance by attorney or in person, to relieve them from an absolutely ex parte character, except in the cases of Little vs. Ingersoll and Mansell’s Appeal. In the former, Columbia Thaw, after she had arrived at age and married, filed a bill to set aside all these proceedings in the Orphans’ Court and to recover her undivided interest in these lots. The defendant insisted upon the sufficiency of the .Orphans’ Court proceedings, and also relied upon a deed executed by Miss Thaw, after her arrival at age, releasing all her interest in the land to Favier. The evidence failed to sustain her contention in reply, that she was a minor at the date of this deed. The justice below, in his opinion, affirmed his belief that the Orphans’ Court had jurisdiction to render the decree; and in the decree he incorporates the “opinion” that the title to the lots is vested in the defendant and therefore dismissed the bill, with costs. The case went to the General Term on appeal and the decree below was modified by expunging so much of this ruling as affirmed the sufficiency of the defendant’s title to the property. As far as this action went, it was a direct and intentional refusal to affirm the validity of the title under the Orphans’ Court proceeding, although the General Term denied the right of the complainant to recover in the face of her deed of release, executed after she attained full age.
Mansell’s appeal was from an order of the Orphan’s Court authorizing a guardian to borrow money upon the real estate of the ward and secure the loan by deed of trust. *386 The case was then referred to the equity justice who refused to ratify the order, and certified the case to the General Term. That court’s opinion, as expressed by Mr. Justice Olin, asserts that “The power to order the sale of an infant’s estate, given to the Orphans’ Court, subject to the approval of a court of equity, includes the power to mortgage, which is a conditional sale,” and that since it is “agreed on all hands a court of equity may authorize a sale or mortgage, the assent by the Orphans’ Court cannot invalidate the act of the chancellor;” and the decree approved of the order of the Orphans’ Court. But it is apparent that the General Term based its ruling upon the assumption of the jurisdiction which is the subject of the present inquiry. Whether the result deduced from that assumption was correct or not, or whether the act of the Orphans’ Court may be justified upon other grounds than those stated, it equally remains that the jurisdiction was tacitly assumed, and was not decided after careful argument and deliberation; and that there was practically no'discussion whatever of the question now before us. In declaring, as we do, our conviction that this assumption was not well founded, we are, therefore, not called upon to dissent from a solemn adjudication after a deliberate examination by a court of last resort.
All of the other cases referred to seem to have passed, sub silentio, and were decreed ex farte, as matters of course, apparently without a word of controversy. They are therefore merely reiterated instances of a faulty practice by a court oí limited jurisdiction, and the frequency of the usurpation only magnifies the wrong.
We see nothing in this repetition of errors that establishes any rule of property which will be disturbed to the public detriment by a return to a proper practice. This court has not hesitated to correct such errors in its own procedure when brought to its notice, however long continued. A practice has existed here for many years to refer an equity cause to the auditor instead of to an examiner to take testimony. In the cases of the Phœnix Ins. Co. vs. Grant this course was adopted, in accordance with this well-estab *387 lished usage ; and the proofs taken under this reference with the accounts were before the General Term in 3 Mac Arthur, 48, upon exceptions. Objection was there made for the first time that it was improper to refer a cause to an auditor to establish in the first instance a fact put in issue by the pleadings, but that the testimony, at that stage of the proceedings, should first be taken in the usual way before an examiner. It was not controverted that the reference accorded with oft-repeated precedent, but the court, when the objection was thus called to their attention, did not hesitate to condemn the practice, reverse the decree, and turn back the litigation to the point where this error was committed.
How this method of making sale of an infant’s real estate began in this ^District, does not appear. It commenced about the time of the faulty decree in Bank vs. Ritchie. It may be .that the judge, or Registers of Wills, or both, at the time, may, before their appointment, have been citizens of States where such powers were by statute expressly conferred upon the courts of probate. Assuming the existence of the jurisdiction, the language of the act of 1798 would have been a sufficient invitation to its exercise; and that which had its origin in inadvertence, was probably perpetuated through inattention, on the application of parties who wished to avail themselves of what they supposed to be a more speedy and economical mode of attaining their purpose.
It was not to be expected that the Register of Wills, whose powers under the old system of judges were very great, would be disposed to discourage a practice which threw into their hands profitable fees, that under another system would have been received by the clerk of' the chancery court; and their interests were thus directly involved in its continuance.
In this class of cases there is always very earnest insistence, by the party who fears to lose his case, upon the great injury which a departure from alleged precedents may inflict upon innocent purchasers, other than himself. The *388 courts will always be willing to protect this class of suitors ; but their interests should not be preferred to those of innocent heirs. The purchasers’are volunteers who invest with expectation of gain; adults who are able to inform themselves of the condition of the title which their interests stimulate them to acquire, and who have the power to indemnify themselves from loss by discounting the risk from the purchase money or by guaranties and warranty of title. They are under no obligation to purchase and are not presumed to do so until they have been satisfied as to the title they wish to acquire. They know that men not unfrequently have brought law suits and they are not too innocent to have heard the legal maxim, caveat emptor. ,But the infant, whose property is to be sold, has none of these personal powers of protection. No little ceremony is observed in bringing the minor before the Orphans’ Court that its guardian may be formally appointed; but this formality complied with, the child, in a case conducted as this was, would no more know that it was about to be deprived of its inheritance, without due process of law, than if it were at its play in another hemisphere.
People in these days seldom break into the possessions of others with a strong hand and hold them as by right of conquest. The claim is always under some color of title; and although the party in possession may defend under a judgment of a court possessed of ample jurisdiction to decree in a cause properly before it, his defence will he disallowed if there has been a want of such jurisdiction in the court to decree, however innocently he may have purchased property, the rightful title in which had not been lawfully diverted from the proper owners. 3 How., 760; Stewart vs. Lessee of Hickey; Windsor vs. McVeigh, 93 U. S., 277 ; Earle vs. Turton, 26 Md., 23.
That the legality of such reckless methods of dealing with the real estate of minors was never questioned during all this time, as is asserted, we find it difficult to realize. In this case, which is the only one with the facts of which we have been made acquainted there certainly is nothing to *389 show any acquiescence in the decree of the Orphans’ Court on the part of the plaintiff. Favier, the purchaser from Mrs. Thaw, evidently entertained but slight confidence in the title he had thus acquired, for he hastened to obtain from Columbia Thaw a deed of release of her share as soon as she attained age, which he took care to have recorded many years before her mother’s (trustee’s) deed to him was placed on record. The brother and sister, during the year the mother died, brought a joint action of ejectment for the lands, which was afterwards dismissed, as the plaintiff testifies, by the attorney in the case without his consent or knowledge. Columbia Thaw afterwards instituted the equity suit as we have seen; and the plaintiff’s prosecution of this action completes the proof that in this case at least the jurisdiction of the Orphans’ Court has been persistently disputed.
Many of the numerous cases where courts of great distinction have overruled faulty decisions of long standing, involved principles and values infinitely in excess of any amount that may depend upon the present ruling; but those courts nevertheless declared, as we must, that apprehensions of troublesome consequences from a conscientious judgment cannot avail to induce a court to decide against its clear convictions. We suppose the effect of this decision will be much less extensive than the counsel for the defendant have persuaded themselves may follow the loss of their case; for the lapse of time and honest settlements with wards must have left few cases open to controversy. But however this may be, we adopt the reply of Chief Justice Dallas in Smith vs. Doe, 2 Brod. & B., 581, where a similar consideration was urged: “If principle and practice are at variance, practice must give way; and in this case as in others, if the mischief is extensive, the proper remedy, if such there be, must be sought for and applied elsewhere.”
The question we have been considering relates not only to the propriety of this practice in the past, it involves the proper methods of procedure to-day and in the future in this class of cases.
*390 If a guardian, in 1844, had the right to institute such a proceeding and obtain such a decree, the guardian of to-day has the same right to its fullest extent, and the court has no discretion to decline to entertain his application, for no legislation has intervened to impair whatever rights existed in 1844.
We believe no such authority existed then, and that none such exists now; and we shall therefore reverse the judgment below, and it is so ordered.
Note. — This case having been heard before two judges only, a motion was made for a rehearing before a full court, which was accordingly granted.
S^L lb J. C. 700.